**AMERICAN PIPE & STEEL CORPORA-TION, a corporation, Plaintiff,**

v.

**FIRESTONE TIRE & RUBBER COM-PANY, a corporation, Defendant.**

No. 459/57.

United States District Court
S. D. California,
Central Division.

July 19, 1960.

---

Landon Morris, Los Angeles, Cal., for plaintiff.

Trippet, Yoakum, Stearns & Ballantyne, Los Angeles, Cal., for defendant.

**WESTOVER, District Judge.**

The United States Government gave to Firestone Tire & Rubber Company, defendant herein (hereinafter referred to as Firestone), a contract for the fabrication and construction of Corporal Missiles. At the same time the Government gave to Firestone a contract for the manufacture of shipping containers for the missiles.

The original contract covering the missile containers provided they were to be made of wood, but after a number had been so constructed it was decided by the Government that metal containers would be superior. Redesigned plans and specifications for metal containers were given Firestone. In the redesigned plans and specifications torsion bar lever arms were designed, the purpose of which was to hold the missile in place and keep it from moving around within the container while in transit. The plans and specifications furnished Firestone by the Government called for torsion bar lever arms five inches in diameter at the widest point.

After Firestone received the original contract for wooden containers, it sublet to other contractors the work of manufacturing the containers. Among the subcontractors was Hammond Manufacturing Company. Hammond originally manufactured wood containers. After the design of the containers had been changed from wood to metal, Hammond manufactured ten of the metal containers.

Although Firestone's plans and specifications from the Government indicated the torsion bar lever arms were to be five inches in diameter at the widest point, nevertheless, Firestone, in its preparation of drawings for metal containers to be used by Hammond and subsequently by the plaintiff herein, reduced the metal torsion bar lever arm from five inches to four inches. When the metal containers with the four-inch torsion bar lever arms were delivered by Hammond and put into use by the Government, it was discovered the four-inch torsion bar lever arms bent under stress and use and distorted and were unsatisfactory. Firestone attempted to obtain authority from the Government for use of the four-inch torsion bar lever arm but never received such authority. Firestone also attempted to rectify the defect by placing along the side of the torsion bar lever arm a steel plate. Firestone attempted to obtain authorization from the Government for use of the steel plate, but no authorization was ever received from the government.

As hereinabove stated, when Firestone entered into the contracts with plaintiff for fabrication of metal containers it gave plaintiff plans and specifications for the containers. The plans and specifications called for four-inch torsion bar lever arms. Firestone knew, prior to execution of the contracts with plaintiff, that the torsion bar lever arms bent and distorted under stress and strain; that use of four-inch torsion bar lever arms had not been authorized by the Government, and that its attempt to rectify the fault by use of a steel plate had also not been authorized.[1] Nevertheless, with this

---

1. Lyle Kenyon Liljegren, one of the main witnesses for defendant, testified that he was the general manager for the United States Army Ordnance District of the Los Angeles area. The question arose as to whether or not the drawings with the four-inch torsion bar lever arm had ever been approved by the Government. The witness testified as follows:

"The Witness: I would have to answer to your question that the drawings were not approved. They haven't even been

knowledge at hand, Firestone went ahead, entered into the contracts with plaintiff and gave to plaintiff plans and specifications which included four-inch torsion bar lever arms.[2]

Upon execution of the contracts plaintiff immediately commenced work upon the metal containers and was progressing thereon when it received notice from Firestone to cease installation of the torsion bar lever arm until a new bar could be designed, tested and approved by the Government.[3] Upon receipt of the notice, plaintiff at once stopped all work upon the containers.

The entire facilities of plaintiff in Alhambra, California, had been given over to performance of the contract, and at the time of the stop order the containers in various stages of completion were scattered over the floor of plaintiff's manufacturing plant. Plaintiff contends that inasmuch as it did not know whether the stop order in question would remain in effect for days, weeks or months, it was unable to use its premises for any other purpose.

Some thirty-odd days after receipt of the stop order, defendant gave plaintiff new plans and specifications covering a

approved to this date. But I could illustrate with another point.

"The Court: Just a minute now. You told me that these drawings that Firestone was supposed to have prepared and delivered on or before September 31, 1954, have never been approved.

"The Witness: If by approval we mean that they were signed approved in the title block. However, the volume of work was such that this engineering order which stated that we now wanted these drawings used in production was our means of approving the use of those drawings for the production contract.

"The Court: Then am I to understand your testimony is drawings were never formally approved, but they were approved inferentially?

"The Witness: Correct.

\*    \*    \*    \*    \*

"The Court: Let me go back and restate the question so that we will be sure we don't misunderstand. I understand that by Exhibit 1, which is dated March 9, 1954, Firestone was authorized to prepare drawings to be delivered on or before September 31, 1954. These drawings were never formally approved, but they were inferentially or informally approved as of July 20, 1954, and in the approval they called for a four-inch torsion bar lever arm, is that right?

"The Witness: That is correct."

2. E. R. Hutchinson was called as a witness by and on behalf of defendant and testified that he worked in the engineering department during the calendar year 1954, in the guided missile division, of Firestone.

"The Court: Did you know when the contract was entered into between the plaintiff and the defendant that there

were going to be some changes in the drawings?

"The Witness: I had every reason to expect them. It would be the first time it hadn't happened in that kind of program.

"The Court: Then you gave them drawings they were supposed to follow, knowing at that time the drawings were not adequate?

"The Witness: No, I didn't say that. I said I knew there would be changes in the drawings. Other containers had been built to those drawings at that time and had passed the testing required in 3021A, and I considered them adequate at that time.

"The Court: You knew the government was changing from wooden containers to metal containers?

"The Witness: Had previously changed. Our contractor, another contractor, had already built about 45 metal containers and we had had the acceptance of the Ordnance Office inspectors. They had passed the testing in 3021A.

"I would expect further changes, because every item we had at that time, that was the pattern, but I don't say we gave them inadequate drawings. I don't feel we did."

3.    [Copy of Stop Order Telegram]
"American Pipe &    September 16, 1954
  Steel Company
2201 West Commonwealth
Alhambra, California
"Please Stop Further Production And Installation Of Torsion Bar Lever Arms; Stop Installation Of Guide Bars For Lever Arms; Stop Further Drop Testing And Pressure Testing. Reference Purchase Order 437–7539.
            "The Firestone Rubber Company
              B. B. O'Brien"

redesigned torsion bar lever arm; whereupon plaintiff completed its contract satisfactorily, delivered the containers and was paid by Firestone the price as set forth in the contract.

The contracts between plaintiff and defendant provided, in part, as follows:

"The Firestone Tire & Rubber Company may at any time by written order, make changes in any of the drawings, designs, specifications, method of shipments or packing and place of delivery.

"If any such change causes an increase or decrease in the cost of the unit price of the articles ordered, an equitable adjustment shall be made in the contract price by amendment thereto."

"(A) If any change materially affects the estimated cost of, or time required for the performance of the work, an equitable adjustment shall be made in the fixed price or time of performance or both."

Inasmuch as the change in the torsion bar lever arm caused an increase in the estimated cost and in the unit price of the containers, an equitable adjustment was made between the parties by which defendant paid plaintiff $46,259.88 in addition to the contract price. However, plaintiff contends the change in design of the torsion bar lever arm caused a delay of approximately thirty days in performance of the contract, during which period plaintiff's manufacturing plant had remained idle and overhead accumulated, and that consequently not only was plaintiff entitled to an equitable adjustment as to the unit price but also to an equitable adjustment for overhead resulting from the time lost by reason of the stop order.

Defendant admitted liability for direct cost occasioned by the stop order but denied liability for all indirect cost. As a result of the controversy this action was filed.

The first question to be resolved by the Court is whether the contracts between plaintiff and defendant were Government contracts. The contracts between defendant and the United States of America were Government contracts, having as their subject the construction and manufacture of missiles and missile containers for the United States of America. Plaintiff contends that as the contracts now before the Court were entered into by and between two private corporations they were not Government contracts but private contracts.

When defendant proposed to enter into the contracts herein involved with plaintiff, notice of the proposed contracts was given to the Government, as provided in the contract between the Government and Firestone. Plaintiff knew Firestone had the prime contract with the Government and that plaintiff's subcontract was a part of the prime contract. No merit is found in the contention that the contracts herein (between plaintiff and defendant) were not Government contracts.

The next question confronting the Court is the meaning of the words "equitable adjustment" as used in the contracts. Defendant contends this term has been defined by the United States Supreme Court in United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53, and that, according to the definition as promulgated by the Supreme Court, plaintiff cannot recover indirect costs. The Supreme Court said, 317 U.S. at page 67, 63 S.Ct. at page 124:

"* * *; for 'increase or decrease of cost' plainly applies to the changes in cost due to the structural changes required by the altered specification and not to consequential damages which might flow from delay taken care of in the 'difference in time' provision. * * *"

If the interpretation of the term "equitable adjustment" as made by the Supreme Court in the Rice case, supra, excludes indirect costs, then judgment herein must be rendered in favor of defendant.

The Supreme Court went on to say, 317 U.S. at page 68, 63 S.Ct. at page 124:

> "* * *. For delays incident to such unanticipated changes, the contractor was under either section to be granted a 'compensating extension of time.'"

■■ This Court is of the opinion the case at bar is controlled by the decision of the Supreme Court in the Rice case, supra, and that the term "equitable adjustment" does not include indirect costs, as claimed by plaintiff herein.

■■ Those who enter into government contracts are usually not novices. Generally they have the benefit of past experience and should be cognizant of the terms used in such contracts.[4] In interpreting a contract, a court should not rewrite the contract between the parties. Under California law, where a written agreement attempts to cover all relationships of the contracting parties, interpretation to be given the contract is determined as a matter of law solely from the instrument itself, if possible, without making any part of the instrument nugatory. General Casualty Co. v. Azteca Films, Inc., 9 Cir., 278 F.2d 161.

It is plaintiff's contention in this action that at the time the stop order was received plaintiff was in the midst of completing the contract and had, scattered around the floor of its manufacturing plant, missile containers in various stages of completion. Although plaintiff has taken the position the stop order in question caused complete stoppage of the work, Firestone did not so order. The stop order directed:

> "Please stop further production and installation of torsion bar lever arms."

There is no evidence before the Court to indicate that work on the rest of the container could not have proceeded as planned.

Insertion of the new, redesigned torsion bar lever arms could probably have been effected at any of various steps in the assembling of the containers. There is no evidence before the Court that redesigning of the torsion bar lever arm occasioned redesigning of any other part of the container; and although it is plaintiff's contention that the redesigning of the torsion bar lever arm held up work for thirty days there is no evidence to sustain such contention. It is true that plans and specifications for the new bar were not obtained for thirty days, but there is nothing in the record to indicate work on other parts of the missile container could not have been continued.

An equitable adjustment was made in this case relative to cost of the individual units. An equitable adjustment was also made with reference to the time required in performance of the contract. After the stop order had been received by plaintiff and work had been stopped upon the containers plaintiff obtained from defendant additional time in which to complete its contract.

From the foregoing, the Court will make the following findings of fact:

1. That the contracts between plaintiff and defendant are Government contracts.

2. That defendant had at any time, by written order, a right to make changes in any of the drawings, designs or specifications furnished to plaintiff.

3. That defendant knew or should have known when it entered into the contracts with plaintiff that it would be necessary to make changes in the drawings, designs and specifications in the torsion bar lever arm, unless authorization could

---

4. "Men who take $1,000,000 contracts for government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work." Wells Bros. Co. v. United States, 254 U.S. 83, 87, 41 S.Ct. 34, 35, 65 L.Ed. 148.

be obtained from the Government to use a four-inch torsion bar lever arm or to use a plate attached thereto.

4. That defendant did not receive authorization from the Government at any time to use the four-inch torsion bar lever arm or to attach a plate thereto.

5. That defendant had a valid reason for issuing the stop order in question.

6. That defendant gave to plaintiff in writing an order to suspend installation of the four-inch torsion bar lever arm.

7. That the notice given to plaintiff did not stop work on the entire container but stopped only the installation of the torsion bar lever arm. No order was ever given by defendant to stop all work on the contract.

8. That immediately upon receipt of the stop order plaintiff ceased work on the containers. Some thirty days later defendant furnished to plaintiff new plans and specifications for the torsion bar lever arm, whereupon plaintiff proceeded with its contract.

9. That the stop order in question was not continued for an unreasonable length of time.

10. That the contracts provided that if the change in drawings, designs or specifications caused an increase in cost of the unit price or the estimated cost of the work, an equitable adjustment would be made in the contract or fixed price.

11. That an equitable adjustment was made by defendant with plaintiff because of the increase in the cost of the unit price or in the estimated cost of the containers.

12. That the contracts provided that if change in the drawings, designs or specifications materially affected the time required for performance of the work, an equitable adjustment was to be made in the fixed time of work performance.

13. That an equitable adjustment was made by defendant as to the time of performance of the work, as an extension of time was granted to plaintiff by defendant to complete its contract.

14. That plaintiff is not entitled to recover for loss of overhead or use of its premises during the time the stop order was in effect, inasmuch as an equitable adjustment has been made by defendant with plaintiff as provided in the contract.

Judgment is in favor of defendant. Findings of fact, conclusions of law and judgment are to be prepared by counsel for defendant for submission to the Court in accordance with the rule.