157 N.J. Super. 357 (1978)
384 A.2d 1121
EDWIN J. DOBSON, JR., INC., PLAINTIFF,
v.
RUTGERS, THE STATE UNIVERSITY ET AL., DEFENDANTS AND THIRD-PARTY PLAINTIFFS,
v.
BROADWAY MAINTENANCE CORP., THIRD-PARTY DEFENDANTS.
BROADWAY MAINTENANCE CORP., PLAINTIFF,
v.
RUTGERS, THE STATE UNIVERSITY, ET AL., DEFENDANTS AND THIRD-PARTY PLAINTIFFS,
v.
EDWIN J. DOBSON, JR., INC., THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 12, 1978.
*364 Mr. Harold G. Smith for plaintiff Dobson (Messrs. Wilentz, Goldman & Spitzer, attorneys) and Mr. Richard Bonamo and Mr. Jerome Reiss of the New York Bar.
Mr. C. Stephen Barrett, III, and Mr. Joseph R. McMahon for plaintiff Broadway Maintenance (Messrs. Lum, Biunno & Tompkins, attorneys).
Mr. Edward Schwartz, Deputy Attorney General, for defendants and third-party plaintiffs, Rutgers, The State University and College of Medicine and Dentistry of New Jersey (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
DWYER, J.S.C.
The parties in this action are identified in Briscoe v. Rutgers, 130 N.J. Super. 493 (Law Div. 1974). The court uses the same designations for the parties in this decision as it used therein.[1] The caption in this action *365 is changed because on the eve of the trial, State and Briscoe settled the one action which concerned Briscoe, of the three consolidated actions involving Briscoe, Dobson and Broadway, except for two claims for indemnification which State reserved against Briscoe.
In addition to certain specialized claims asserted by each, Dobson and Broadway are suing on alleged breaches of express and implied promises under their respective contracts to perform certain work for the construction of a medical school and to recover added costs incurred by each because the period of contract performance extended beyond the 700-day period specified in the contract by 25 months in respect to Dobson and 29 months in respect to Broadway.
Analysis of the claims shows that they are not all attributable to lapse of time such as may be the case where a wage increase occurs under a union contract, when a date for a wage increase passes, or interest is lost on retainage which is held by an owner. Some of the claims are based on the alleged lack of stairs and elevators at scheduled dates so that workers had to climb ladders and lift material by hand, with the result that workers used more time to perform work than had been anticipated. Each also alleges that it incurred substantial damages due to Rutgers' failure to deliver on time: (i) "roughing in" drawings for equipment which Rutgers was to furnish or cause other contractors to furnish; and (ii) equipment, with the consequence that the hookup work had to be done piecemeal and over a protracted period of time.
Before setting forth the defenses asserted by State and the issues, the court will set forth certain provisions of the contracts and some pretrial history of this matter so that the issues may be put in perspective.
The contract documents are massive. In 1964 and 1965, when officers of Rutgers, its attorneys and the architect were preparing the contract documents, they believed that Rutgers was subject to the public bidding statute, R.S. 52:32-1 *366 et seq. As the statute was then written,[2] an entity subject to it could not let a contract to construct a building on the basis of one general contract. The statute specified that contracts for such work as electrical, mechanical, iron and general construction had to be bid and let separately. Accordingly, Rutgers drew the specifications, bids and contracts so that there would be multiple prime contracts and contractors on the one job.
The sources of funding for the medical school were federal grants as well as certain Rutgers funds. Up until the commencement of this project, it was the largest building in size and cost Rutgers had undertaken. Aggregate estimated cost was $19,300,000 of which $14,188,636 was for the six prime contracts for construction. Rutgers sought in the "General Conditions," to minimize potential delay in execution of the work on the project and to limit its liability for monetary damage resulting from delay.
Rutgers utilized two novel concepts in preparing the General Conditions designed to minimize delay in executing the work. First, it provided in the General Conditions G4-N that the contractor for general construction (which contractor *367 in certain of the General Conditions is called the "General Contractor," but in fact there was no general contractor) should have the following responsibilities:
G4-N.1 UNIQUE ROLE OR RESPONSIBILITY: STAFFING: The General Contractor has the responsibility for being the supervisor, manager, overseer, coordinator and expediter of all of the Contractors and of the total construction process and all of its parts, in accordance with the Contract. In executing the duties incurred by these responsibilities, the General Contractor shall provide sufficient executive and supervisory staff in the field to enable efficient and expeditious handling of these matters. There shall be at least one full-time Project Manager assigned by the General Contractor to his home office, as well as the field staff referred to above; the Project Manager shall attend each Progress Meeting at the site.
G4-N.2 OWNERS RELIANCE UPON GENERAL CONTRACTOR: The Owner relies upon the organization, management, skill, cooperation, and efficiency of the General Contractor to supervise, direct, control and manage the General Construction work and the efforts of the other Contractors, so as to deliver the intended building conforming to the Contract and within the scheduled time.
G4-N.3 OTHER CONTRACTORS' RELIANCE UPON GENERAL CONTRACTOR: All other Contractors shall rely upon the organization, management, skill, cooperation and efficiency of the General Contractor to supervise, direct, control and manage the General Construction work and the efforts of the other Contractors so as to deliver the intended building conforming to the Contract and within the scheduled time.
Second, Rutgers employed a consultant on the critical path method[3] to develop an arrow network diagram to illustrate *368 one feasible method of executing the project and a computer printout schedule showing early start-early finish dates and late start-late finish dates for all major activities. This work was reviewed by an independent general contractor for feasibility of completion within the estimated time of 700 days. Rutgers then incorporated the network diagram and schedule, as an illustration of one feasible way of executing the project, in the bid documents.
When called by Dobson, the architect testified at trial that he helped the attorneys for Rutgers prepare all provisions of the contract except for those pertaining to the critical path method (CPM). The General Conditions pertaining to the role of CPM on the project in relevant part are set forth below.[4]
*369 The structure which was to house the medical school consisted of three components. These included a two-story teaching wing with a basement and an eight-story faculty wing with a basement, these two structures being joined by a two-story structure with a basement called the link. The eight-story faculty wing was designed to house offices and research *370 laboratories on the third floor and each floor above. The vertical piping for these laboratories came from the horizontal piping in the galleries described below.
Three design features are particularly relevant in understanding the issues in this case. The structures did not have a steel frame. Poured concrete columns rising from below *371 the basement floor slab to the first floor and then from the floor slab of each floor level to the eighth-floor level formed the weight-bearing structure and the frame from which precast concrete panels to enclose the interior were to be hung. In the faculty wing, a gallery located in the center of each half of each floor slab in that component of the faculty wing rose from the third-floor level through the eighth-floor level *372 so that there were two openings measuring 104 feet by 7 feet to permit a myriad of pipes for electrical wiring, water, specialized gases and acid drain, as well as regular waste, pipes to rise vertically to each floor and then branch laterally to service the laboratories which were grouped around each gallery. On each side of the faculty wing a set of towers was to be constructed. One housed stairs. One housed the elevators. One housed lavatories. One housed the closets for maintenance storage and janitorial sinks.
Rutgers provided in the General Conditions: "Each Contractor agrees to cooperate and coordinate his own operations in order to meet effectively all scheduled task deadlines." G4-F.4. In the form of agreement signed by each *373 contractor and Rutgers after the award of contracts, but which form was in the bid documents, Rutgers provided the following:
EIGHTH: The Bond, General Conditions, Drawings, Specifications, Advertisement, Instructions to Bidders, Bid Form, Addenda, if any, and this agreement form the Contract, hereinafter called the `Contract', between the Contractor and the Owner and all thereof are as fully a part of the Contract, as if attached hereto or set forth herein at length.
SEVENTH: If the Contractor is delayed in completion of the work by any act or neglect of the Owner, Architect, or of any other Contractor employed by the Owner, or by changes ordered in the work, or by strikes, lockouts, fire, unusual delay by common carriers, unavoidable casualties, or any cause beyond the Contractor's control or by any cause which the Architect shall decide to justify the delay, then for all such delays and suspensions the Contractor shall be allowed one day additional to the time limitations herein stated for each and every day of such delay so caused in the completion of the work, the same to be ascertained solely by the Architect, and a similar allowance of extra time will be made for such other delays as the Architect may find to have been caused by the Owner.
No such extensions of time shall be made for any one or more delays unless within five (5) days after the beginning of such delays a written request for additional time shall be filed with the Architect. In case of a continuing cause of delay, only one request is necessary.
No claim for damages or any claim other than for extensions of time as herein provided shall be made or asserted against the Owner by reason of any of the delays herein mentioned.
In the General Conditions Rutgers provided:
G4-D.1 SEPARATE CONTRACTS: The Owner plans to execute this project by awarding separate Contracts, the work of which shall proceed simultaneously.
* * * * * * * *
d. Failure of a Contractor to keep informed of the work progressing on the site and failure to give notice of lack of progress or defective workmanship by others shall be construed as acceptance by him of the status of the work as being satisfactory for proper coordination with his own work.

*374 e. It is agreed that the Contractor shall not be entitled to any damages or extra compensation from the Owner on account of any work performed by the Owner or other Contractors, that in any way affects the work under this Contract.
f. In case the Contractor, by his own acts or the acts of any person or persons in his employ, shall unnecessarily delay, in the opinion of the Architect, the work of the Owner or other Contractors, by not properly cooperating with them or by not affording them sufficient opportunity or facility to perform work as may be specified, the Contractor shall, in that case, pay all costs and expenses incurred by such parties due to any such delays and he hereby authorizes the Owner to deduct the amount of such costs and expenses from any monies due or to become due the Contractor under this Contract, based on the investigations and recommendations of the Architect. Nothing contained in this paragraph shall, however, relieve said Contractor from any liability or damage resulting to the Owner on account of such delay or delays. [Emphasis supplied]
G4-D.2 MUTUAL RESPONSIBILITY OF SEPARATE CONTRACTORS: If, through the acts or omissions of the Contractor, any other contractor or any subcontractor shall suffer loss or damage on the work, the Contractor agrees to settle with such other contractor or subcontractor by agreement if such other contractor or subcontractor will so settle. If such other contractor or subcontractor shall assert any claim or bring any action against the Owner on account of any damage alleged to have been sustained, the Owner shall notify the Contractor, who shall defend, indemnify and save harmless the Owner and pay and satisfy any judgment or award entered against the Owner in any such action and shall also pay all costs and expenses, legal and otherwise, incurred by the Owner therein or thereby. [Emphasis supplied]
* * * * * * * *
G4-D.6 EXTENSIONS OF TIME:
a. If the Contractor is delayed in the completion of the work by any unforeseeable cause beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Owner, acts of another Contractor in the performance of a contract with the Owner, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors *375 due to such cause, if the Contractor shall, within three (3) days from the beginning of any such delay notify the Owner in writing through the Architect, of the causes of delay, who shall ascertain the facts and the extent of the delay and shall extend the time one additional day to the time limitations herein stated for each and every day of such delay so caused for completing the work when the Architect's judgment and findings of fact justify such an extension, and such judgment and findings of fact thereon shall be final and conclusive on the parties hereto. [Emphasis supplied].
b. No claim for damages or any claim other than for extensions of time as herein provided shall be made or asserted against the Owner by reason of any of the delays mentioned in this Contract. [Emphasis supplied]
As mentioned in footnote 4, the section of the General Conditions for Time and Scheduling which covered CPM provided for liquidated damages in the amount of $200 a day. In relevant part it provided:
* * * * * * * *
G4-F.3
It is further agreed that time is of the essence of each and every portion of this Contract wherein and whereby a definite and certain length of time is fixed by the Critical Path Method for the performance of any act whatsoever; and where under the Contract an additional time is allowed for the completion of any work, the new time limit fixed by such extension shall be of the essence of this Contract.
Rutgers received initial bids on this project in June 1966; hence the computer printout schedule included as an illustration in the bid and contract documents lists a June 1966 starting date. However, Rutgers rejected all bids and readvertised for bids to be received in October 1966, and made the awards based thereon; hence the illustrative schedule had to be corrected by five months.
The project did not run smoothly. Following substantial completion Dobson commenced suit against Rutgers in 1971. Since State had assumed all contracts, it suggested that a panel with an independent group of consulting engineers *376 conduct hearings to see if the matter could be resolved. The panel conducted factfinding hearings without prejudice to the rights of the parties. Briscoe, Dobson and Broadway appeared before that panel. After working for six months, the panel made its recommendations. Briscoe, Broadway and Dobson rejected them. Briscoe and Broadway then filed suit against Rutgers.
Briscoe in its complaint alleged in part that (i) Rutgers had misrepresented that the construction project could be completed in 700 days when in fact Rutgers knew, or should have known, that it could not be completed in less than 33 months and, in fact, was completed in 48 months; (ii) Rutgers retained management and supervision of the six prime contractors and Rutgers intended its agents, the architect and CPM consultant, to carry out their responsibilities of supervising the project for Rutgers; (iii) Rutgers failed to coordinate the work and actively interfered with Briscoe's work, and (iv) the contract should be reformed because of fraud. Briscoe asserted no claims against either Dobson or Broadway.
State in its answer to Briscoe admitted it held $406,882 of retainage, but asserted a set-off of $425,659 based on Briscoe's failure to perform its duty of coordination and alleged $425,659 was the amount Briscoe had in its bid for the coordination.
State asserted separate defenses based upon provisions of the contract. Based on Article SEVENTH of the form of Agreement and provision G4-D.6 of the General Conditions Briscoe had no right to money damages but only to extension of time for which it has not made proper application. State also asserted that all delays complained of were specified in the contract documents, and under the terms of the contract Owner is exculpated from damages for the alleged causes of delay. As to the other damages, Briscoe did not comply with G4-G.14 by filing timely notice.
State asserted a counterclaim against Briscoe, in part to recover the amount of money Briscoe had included in its *377 bid to do coordination work, to hold Briscoe responsible for any damages sustained by Dobson and Broadway for delay by reason of Briscoe's acts and failures to act, and to demand that Briscoe defend, indemnify and hold harmless Rutgers against the suit and claims of Dobson and Broadway under G4-D.2 of the General Conditions.
State filed a third-party action against each of the respective sureties for Briscoe, Dobson and Broadway, demanding that each defend Rutgers and indemnify and hold harmless Rutgers against the respective claims of the other two contractors under the provisions of G4-D.2.
Neither Dobson nor Broadway asserted any claim against Briscoe. Each contends that it has no contractual relation with Briscoe, but only with Rutgers.
Omitting, for the present, specialized claims such as those for retainage, Dobson asserted that Rutgers failed to properly coordinate and supervise the work, failed to take affirmative action to compel adherence to the work schedule, affirmatively disrupted Dobson's work by directing Dobson to perform out of sequence of scheduled operations and, finally, that the delay was so inordinate that the parties could not have contemplated it at the time of contracting. Again omitting specialized claims, Broadway asserted Rutgers failed to make decisions on time which it was obligated to make, failed to coordinate the work, failed to furnish drawings and equipment on time, directed the architect not to process shop drawings for equipment Rutgers was to furnish for over one year, and failed to allow Broadway to reschedule work in accordance with the actual pace of the work.
State in its answers conceded it held certain retainage and owed money on one change order to Broadway. It denied the allegations of the complaints and asserted separate defenses which were the same as those set up in the Briscoe answer. It also asserted a counterclaim against Dobson for Dobson to defend the action against Rutgers based on the claims of Briscoe and Broadway, and to hold Rutgers harmless from any judgment entered thereon under G4-D.2. It asserted a *378 similar counterclaim against Broadway for Broadway to defend and indemnify Rutgers against the claims of Briscoe and Dobson under G4-D.2.
State had taken the position in its pleadings that each party and its surety had the obligation to defend Rutgers in the lawsuit against the claims asserted by the other parties under G4-D.2,[5] but had neither formally tendered active control of the defense to them nor specified in any particularity what claims of each of the plaintiffs State asserted they should defend.
[The court here stated that it had directed State to file a specification of the claims which it desired Dobson and Broadway to defend, because under G4-D.2 each had only to defend claims based on its own actions or failures to act and not any suit. The court held Briscoe's claims of fraud were beyond the scope of G4-D.2. Upon State's failure to properly specify the claims to be defended and tendering the defense to Dobson and Broadway, the court dismissed the claims for indemnity, see U.S. Wire & Cable Corp., v. Ascher Corp., 34 N.J. 121 (1961), on the ground that no organized trial could be held.]
As noted earlier, State settled with Briscoe before trial and the question of Rutgers' right to indemnification against Briscoe became moot except for the reserved claims. Briscoe appeared at trial on the two claims for indemnification.
State also moved before trial for summary judgment, primarily on the basis of G4-D.6 and D.2, and in respect to the specialized claims moved on the basis of an extensive affidavit of the architect. In respect to the latter claims there were disputed issues of fact, Hence, summary judgment was denied as to them.
Plaintiffs in connection with that motion urged that Rutgers' delegation of coordination to Briscoe violated public policy as reflected in the public bidding statutes, which require *379 separate contracts so that the public saves the profit of a general contractor on other contracts, and hence should be disregarded, General Bldg. Contractors, Inc. v. County of Oneida, 54 Misc.2d 260, 282 N.Y.S.2d 385 (Sup. Ct. 1967); General Bldg. Contractors, Inc. v. City of Syracuse, 40 A.D. 2d 584, 334 N.Y.S.2d 730 (App. Div. 1972), aff'd, 32 N.Y.2d 780, 344 N.Y.S.2d 961, 298 N.E.2d 122 (Ct. App. 1973), with the result that Rutgers had to be treated as if it had the responsibility to coordinate the work which it failed to do.
Plaintiffs' argument that Rutgers had this responsibility was based on the premise that an owner who employs several contractors to work on a project simultaneously under a contract with a fixed period of performance has at least an implied obligation to progress the work of all contractors so that each has a sufficient portion of the structure to work in at all times in order to complete the work within the prescribed time period. See Stehlin-Miller-Henes Co. v. Bridgeport, 97 Conn. 657, 117 A. 811 (Sup. Ct. Err. 1922), wherein the city had let a contract for general construction (the work of which was late and left no structure for others to work on) and separate contracts for electrical, plumbing and heating, etc., and the court said:
The rule is undoubted in circumstances such as were present in this case that an implied contract arose on the part of the defendant to keep the work on the building whether done by itself or other contractors, in such a state of forwardness as would enable the plaintiff to complete its contracts within the time limited. [117 A. at 813]
See also, Byrne v. Bellingham Consol. School Dist. No. 301, 7 Wash.2d 20, 108 P.2d 791 (Sup. Ct. 1941); 11 Williston on Contracts (3 ed. Jaeger 1968) § 1295.
Plaintiffs further urged that the breach of the implied contract by Rutgers did not result in damages solely related to delay, but resulted in damages attributable to disruption in work and loss of efficiency of labor because of the climbing of ladders, because stairs and elevators were not delivered on *380 time, see Forest Elec. Corp. v. State, 52 Misc.2d 215, 275 N.Y.S.2d 917 (Ct. Cl. 1966), aff'd 30 A.D.2d 905, 292 N.Y.S.2d 589 (App. Div. 1968), and hence was outside the scope of G4-D.6.
State urged that the provision for delegation to Briscoe of responsibility for coordination did not violate public policy, KEC Corp. v. New York State Environmental Facilities Co., 76 Misc.2d 170, 350 N.Y.S.2d 331 (Sup. Ct. 1973) (agency held exempt from general public bidding statute), and that G4-D.2 should be construed to mean that each of the then plaintiffs had to sue the other and had no direct cause of action against Rutgers. Compare id.
No party either contended then or contends now that the "no damage for delay" clause was invalid. The courts of this State and other states have long held that they are valid. Gherardi v. Trenton Bd. of Ed., 53 N.J. Super. 349 (App. Div. 1958); A. Kaplen & Son, Ltd. v. Passaic Housing Auth., 42 N.J. Super. 230 (App. Div. 1956); Ace Stone, Inc. v. Wayne Tp., 47 N.J. 431 (1966); Annotation, "Construction Delay  No Damage Clause," 74 A.L.R.3d 187 (1976).
In Rutgers v. Kugler, 110 N.J. Super. 424 (Law Div. 1970), aff'd, 58 N.J. 113 (1971), the court held that Rutgers was not subject to the public bidding statute. Where a governmental unit purports to comply with such a statute as the public bidding statute by drawing specifications and advertising under it, if the statute is not applicable, it is not controlled by it. Peter's Garage, Inc. v. Burlington, 121 N.J.L. 523 (Sup. Ct. 1939), aff'd, 123 N.J.L. 227 (E. & A. 1939); cf. A.C. Schultes & Sons v. Haddon Tp., 8 N.J. 103, 108 (1951), and such unit is free of its limitations.
Since Rutgers was not subject to the public bidding statute, the delegation of the responsibility to coordinate to the contractor for general construction did not violate public policy, if that be the public policy of this State. Cf. Gherardi v. Trenton Bd. of Ed., supra, 53 N.J. Super. at 355 (delegation to architect mentioned). The questions that *381 are present are (i) what were the intent of the parties, and (ii) in carrying out the contract, had the parties by their conduct modified the terms of the contract. Such questions normally are decided after trial.
[The court here noted that under the express language of the multiple contracts involved in the KEC case, supra, each contractor gave up the right to sue the owner in return for a right to sue the contractor for general construction for failure to coordinate the work of the other contractors. The court distinguished the case from the matter before it because, under provisions of G4-D.1(f)[6], the delayed contractor might have to sue the owner to collect monies withheld by the owner from delaying contractor to pay the delayed contractor but which funds the owner did not pay voluntarily.]
Since Dobson and Broadway steadfastly refused to sue Briscoe on the grounds that neither had any privity of contract with Briscoe but only Rutgers, the court did not have to determine whether the undertaking of the contractor at fault to pay is a basis for either Dobson or Broadway to maintain an action directly against Briscoe on a third-party beneficiary theory for purposes of deciding the motion.
Since all the material pertaining to delays in the affidavits was intertwined with other claims which could only be re *382 solved at trial, the court denied State's motion for summary judgment.
After commencement of the trial Dobson and Broadway each moved to amend and reduce the amount of damages claimed in the Pretrial Order. As so amended the claims are set forth in Footnote[7] below.
*383 State admitted that it held retainage of $6,352.19 on the Dobson contract and $92,305.44 on the Broadway contract. State also admitted that it owed Broadway $5,273.06 on an outstanding change order. State also asserted a counterclaim for liquidated damages at the rate of $200 a day against Dobson for 25 months, and against Broadway for 29 months, or $152,400 and $176,200, respectively.
Review of the claims shows that they fall into several broad categories, some of which are the same for both Dobson and Broadway and some of which are separate. Dobson's claims 1 to 6, aggregating $73,418.48 are based on problems related to the interpretation of specifications with the possible exception of claim 5 which also relates to the question of providing temporary heat in the winter of 1968 and 1969. Broadway's claims 4, 7 and 9, aggregating $232,900.80, requires consideration of proofs and specifications unique to Broadway. The balance of the claims of Dobson ($416,077.44) and Broadway ($1,364,172) are based on contentions that the orderly sequence of the work as originally planned was changed to their detriment, particularly in the hook-up of owner-furnished equipment (OFE), there was a loss of efficiency due to the late availability of stairs and the elevators with the result that their personnel had to use ladders, *384 and a tremendous increase in the overhead cost of the project due to the extended period of construction as well as losses due to increased wage rates during the extended period.
In terms of the pretrial order the legal issues in relevant part are:
1. Relation of CPM consultant, architect and owner to control of project and/or control of contractors?
2. Duty of contractors to organize work (including duty, if any, of Briscoe to coordinate) in terms of CPM schedules?
3. Responsibility of Briscoe for coordination of work of contractors and meaning of exculpation clauses for Rutgers?
4. What CPM schedule was to be followed under the contract?
5. Were claims for damages and extensions of time filed within time under the contract?
6. Active interference with Dobson and Broadway by Rutgers?
7. Rutgers' obligation to furnish roughing drawings and equipment on time and responsibility in damages, if any, for breach?
8. What damages, if any, are recoverable for delay and/or disruption against Rutgers?
9. Specialized claims?
Upon learning of State's settlement with Briscoe, Dobson and Broadway urged that by that settlement State released funds which it was under a duty to withhold under G4-D.1(f) from Briscoe, which was responsible for the prime cause of the delays, and hence State was liable for breach of contract on that ground as well.
Testimony was received over a three-month period, and over 300 exhibits were introduced into evidence. When Dobson and Broadway rested their respective cases, both as to liability and damages, State moved for judgment.
[The court here reviewed standards for granting and denying motion at close of plaintiff's case, and the inferences *385 which it drew favorable to plaintiffs and upon which it denied State's motion for judgment.
[The court stated that State then rested without putting in any evidence other than that which had been stipulated earlier. The court then stated after review of evidence at a supplemental hearing, that all counsel agreed that Rutgers had never formally approved a "Working Plan" under G4-F.4(c) and that CPM consultant had prepared a post-bid arrow network diagram based on the contractors' logic and that it was not in evidence.
[The court stated that respective counsel for Dobson and Broadway contended that the first computer printout, D-13 (a), controlled the project, and counsel for the State contended that the third computer printout, D-13(c), controlled.
[The court admitted the missing arrow network diagrams and certain computer printout updates.]
The beginning point for analyzing any contract problem is to determine what the terms of the contract are. Accordingly, the court shall consider issue 4 first, then issues 1, 2 and 3 as set forth in the Pretrial Order. The court will then consider issue 5 because it is relevant only after the terms of the contract are determined. Thereafter, the court will consider the remaining issues in order.

4. WHAT CPM SCHEDULE IS TO GOVERN THE RIGHTS OF THE PARTIES ON THIS PROJECT?

Based on the evidence produced at trial and at the supplemental hearing, the court has restated issue 4. The reason for the change is that all parties concede there never was a formally approved working plan by Rutgers as envisioned by the last paragraph of G4-F.4(c) of the General Conditions.
Subsequent to the award of the contracts Dobson and Broadway both conferred with representatives of the CPM consultant and told them of their plans.
*386 Edwin J. Dobson, Jr., whom the court finds had little familiarity with CPM techniques and did not attend the pre-bid conference on CPM was the only spokesman for Dobson for the initial preparation of the CPM arrow network diagram. Until January 1967, when Joseph Palmere, the job foreman, was hired, Edwin Dobson was the only supervisory personnel of Dobson doing any work on the job. He stated that his meeting with the CPM consultant was in his own office. All his remarks were oral. He had no notes. He did not testify about, and was not questioned about, any then proposed changes in logic of execution of the work.
Frank Marks of Broadway, and Elmer J. Butterwei of Broadway (Butterwei), who respectively were the home office supervisor and field supervisor, testified about the early phases of CPM. The court finds that each had knowledge of CPM techniques. Marks attended the pre-bid CPM meeting. Broadway also had under regular retainer John McCarthy, the expert on damages.
After award of the contract Butterwei was assigned to the job. Based on data gathered by other staff members at Broadway and his own analysis of the electrical work to be done and manpower needed, Butterwei furnished the post-bid data to the CPM consultant. He neither testified about, nor was questioned about, change in the logic for execution of the project.
The representatives of Dobson and Broadway all testified that the first computer printout schedule issued in late December 1966 (D-13a) was the basis for planning the job, together with the contract documents. Butterwei testified that there was not a complete schedule until the third update report in March 1967 (D-13c). D-13c included the activities which were to be performed after closing in the structures, which was the end point in D-13a, related to finishing activities such as installing toilets and hooking up equipment.
*387 The architect stated that D-13c was the first CPM schedule with almost complete data and it was the one used most frequently throughout the job.[8]
The arrow network diagram prepared after contract award shows that the activities to close in for each structure are reflected on the set dated December 6, 1966, and those referring to placement of laboratory equipment, Owner Furnished Equipment (OFE), and finishing details are reflected on the set dated January 18, 1967.
The court finds that until D-13c was released there were insufficient data available for a plan for the project to exist. The court finds that D-13a was used by Dobson and Broadway to schedule certain early activities but not the overall project, for it lacked basic data.
In respect to Dobson, Edwin Dobson did not do any scheduling of forces. He entrusted that work to Palmere, who began work in January 1967. He gave Palmere the contract documents, including plans and specifications, the estimated dollar amount in the bid for labor, and D-13a. Edwin Dobson testified that his father had calculated the dollar amount for labor by multiplying the quantity of pipe to be installed by dollar values per unit obtained from an estimating manual.
*388 Palmere testified that he did not formally plot out the build-up of forces but stated he planned to build up his forces as the project progressed. Marks and Butterwei testified that they expected to have the structures rise in a unified fashion from the basements to their respective roofs and to follow with the electrical work in an orderly fashion. From the testimony on how these entities organized their forces and work, including evaluation of the credibility of the witnesses, the court finds that neither Dobson nor Broadway relied upon D-13a in organizing the forces or work for this project except in respect to some very early activities.
The court finds that D-13c was as close to a working plan as existed, and was so utilized by the parties.
Although D-13c indicated when it was released that the project was behind schedule 42 calendar days or 30 working days for the faculty wing and 22 calendar days or 16 working days for the teaching wing utilizing the early start-early finish dates, the late start-late finish dates still called for completion on September 30, 1968, 700 days after commencement of the job, and indicated no change in time for completion of the contract. See McCarthy's statements on cross-examination.
The court makes the following findings and conclusions:
1. Under G4-F.4(c) the data from all contractors had to be incorporated in the working plan.
2. The computer runs set forth in the D-13 series of exhibits are based on the post-bid arrow network diagrams. Until the completion of the diagrams dated January 18, 1967, there was insufficient data for a working plan.
3. D-13(a), released in December 1966, lacked essential data to be the working plan. The bid CPM printout and arrow network diagram were labeled illustrative and were not based on the logic for the project of the contractors. Neither of the foregoing was the working plan.
4. Under G4-F.1 et seq. the contract expressly provided that after bid awards the arrow network diagram was to *389 be drawn and based on the logic of the contractors. Logic in this context meant the combination of material, manpower and equipment, as well as the sequence and timing of operations under which the contractors planned to do the work.
5. Under G4-F.1 et seq. it was envisioned that when the contractors who based their bids on their logic of doing the job pooled their information with the CPM consultant, the initial combination might exceed 700 days. Under G4-F.4(c) the contractors were then to modify their logic to reduce the time to 700 days.
6. For reasons hereinafter stated, Rutgers had two roles under the contract. One was that of owner. The other was that of contractor for OFE. The data for the installation of OFE is not in D-13(a) but in D-13(c).
7. Updatings for the complete project commenced from the data base for D-13(c), because it did not exist before D-13(c).
8. Rutgers was bound by D-13(c) in its capacity as contractor, for it reflected its own input.
9. No party disavowed the logic underlying D-13(c) during the performance of the contract. Dobson and Broadway protested about Briscoe's performance and disputed Briscoe's interpretation.
10. As more fully explained hereafter, all parties elected to perform as best they could and seek damages. No party protested the absence of a formally approved working plan. All acquiesced in the logic reflected on the arrow network diagrams underlying D-13(a) and D-13(c).
11. If D-13(c) is rejected, there is no complete plan for the work called for under the contract and no base upon which to measure any rights or damages.
The court concludes that D-13(c) must be treated as the working plan.

*390 I. RELATION OF CPM CONSULTANT, ARCHITECT AND RUTGERS TO CONTROL OF PROJECT AND CONTRACTORS.

A. CPM CONSULTANT
G4-A.4 of the General Conditions spoke of parties not to the contract but participating in roles with parties to the contract, and included therein are "b. Architect" and "j. Critical Path Method Consultant"
General Conditions for Time and Scheduling, G4-F.1 et seq., show the CPM consultant had no power to order any Contractor to do anything. Although the contractors were under a contractual duty to meet with him and to agree to changes in the sequence of their work or added manpower or equipment, to bring the project back on schedule, G4-F.4(d) Project Control and Updating, the CPM consultant was not given the power to order the contractor to perform in a different manner than he was performing.
In respect to time, the CPM consultant's role was to perform a function similar to that of the independent testing laboratory in respect to material, namely, were the conditions of the contract being met? The CPM consultant was to assist the contractors and to report overall conditions on an objective basis to all parties.
Even though the fee of the CPM consultant was paid by Rutgers, Rutgers had no power to compel the CPM consultant to shift responsibility for performance of work from one contractor to another or to specify that a contractor do what he had not agreed to do without his consent. Rutgers did not have the right to direct the CPM consultant as to how to perform its work. The CPM consultant was not the agent of Rutgers.
No counsel has referred the court to any decision where the role of a CPM consultant has been defined. The court has found none. On the facts in this case the court concludes that all parties treated the CPM consultant as an independent *391 expert and that the CPM consultant should be treated the same as an independent testing laboratory.
Although the architect made some pointed observations about the CPM consultant, no party or other witness made any complaint about the CPM consultant or called any representative of the CPM consultant as a witness.

B. ARCHITECT
Dobson and Broadway have urged that the architect was the agent of Rutgers, particularly in terms of his role in determining whether extensions of time to perform should be granted. They also allege that the architect's failure to grant requested extensions of time amounted to a breach of the contract chargeable to Rutgers, his principal.
G4-B.2 defines the architect's functions under the contract. The architect had authority to review and approve shop drawings and progress payments, to prepare documentation for, and recommendations concerning, change orders, and to issue the certificate of final completion. In addition, that section provided in part:
a. Functions: The Architect interprets to the Owner and to the Contractor the Specifications and Drawings, familiarizes himself generally with the progress and quality of the work, and determines if the work is proceeding in accordance with the Contract.
b. Reports: The Architect will keep the Owner informed of the progress of the work, will guard the Owner against defects and deficiencies in the work of the Contractor, and may condemn work as failing to conform to the Contract.
* * * * * * * *
f. Authority: Other than as provided in the Contract, the Architect has no authority to act either for the Owner or for the Contractor. The Architect, assisted by his Engineers, shall decide the meaning and intent of any portion of the Specifications and Drawings and Addenda where such may be found obscure or be in dispute.
Under certain provisions of the General Conditions, the architect was to act as an umpire or arbitrator.

*392 G4-D.1 Separate Contracts

* * * * * * * *
(c) The Contractor, including his subcontractors, shall keep informed of the progress and the details of work of other Contractors and shall notify the Architect immediately of lack of progress or defective workmanship on the part of other Contractors.
* * * * * * * *
(f) In case the Contractor, by his own acts or the acts of any person or persons in his employ, shall unnecessarily delay, in the opinion of the Architect, the work of the Owner or other Contractors, by not properly cooperating with them or by not affording them sufficient opportunity or facility to perform work as may be specified, the Contractor shall, in that case, pay all costs and expenses incurred by such parties due to any such delays and he hereby authorizes the Owner to deduct the amount of such costs and expenses from any monies due or to become due the Contractor under this Contract, based on the investigations and recommendations of the Architect. Nothing contained in this paragraph shall, however, relieve said Contractor from any liability or damage resulting to the Owner on account of such delay or delays. [Emphasis added]
Under G4-D.6, Extensions of Time, if the contractor is delayed under the conditions stated, then if he notifies the owner through the architect of delay within three days of the commencement of delay, the Architect
* * * shall ascertain the facts and the extent of the delay and shall extend the time one additional day to the time limitations herein stated for each and every day of such delay so caused * * * when the Architect's judgment and findings of fact justify such an extension, and such judgment and findings of fact thereon shall be final and conclusive on the parties hereto.
Under the provisions referred to above, the architect is to interpret specifications and drawings for Rutgers and the contractors. See also, G4-B.5 and B.6. In such a role the architect must be neutral and is not the agent of either. G4-D.1(b) specifies a duty to report his opinions to Rutgers but does not confer any authority upon him to order a contractor to do anything even where he condemns work.
*393 In respect to delays, the architect acts as an arbitrator or umpire. In such a role the architect must be independent and objective; hence, he cannot be an agent of either.
The problems related to the failure to grant extensions will be dealt with after the questions of timely notice. The court notes here that the architect promptly rejected certain requests for extensions of time, but in respect to others he testified that he deferred granting them until completion of the job because in his opinion they were relevant on the question of liquidated damages.
Significantly, the architect was assigned no function under G4-F.1 et seq., Time and Scheduling, which was the domain of the CPM consultant. One attribute of the critical path method is to identify what in the future may cause, or in the present is causing, delay and to take corrective action to avoid or cure it. While a project is under way on which such a technique is being used, the extent of delay for a particular contractor is hard to judge because of the effect of corrective action. However, if complaints of delay are documented and time periods are recorded after the fact, the delay and cause for it can be established.[9]
Whether a contractor suffers delay in overall completion time for a job is determined by the extent to which there was other work on the project which his forces did, or could have done, while the delay in one area prevailed. It is a complex analysis, according to the testimony of the architect.
There is no question that members of the firm of the architect assumed an active role in trying to push the work forward, particularly at the job meetings, trying to get the *394 various contractors to get drawings in for approval, and expediting approval of materials which the contractors were to supply from outside sources. The court was spared the tender of 700 hours of tapes of these meetings by the various parties. However, based on the documentary evidence concerning them, the letters in evidence and the testimony, the court finds that the architect did not assume the role assigned to the owner or owner's representative and performed only the work of the architect.
There is also no question that the architect reviewed the CPM updates as they came out. The architect was on the distribution list. The problem of what material to use for backfill had delayed the project in the period from January 1967 to May 1967. The CPM consultant, in the fourth update released on May 1, 1967, stated in relevant part:
At the April 26, 1967, job meeting and in agreement with the General Contractor, we recommended that some time could be gained through by-passing the basement work, erecting the 1st floor slab and proceeding up through the building. While working on the 4th floor, work could then commence in the basement area and proceed with no interruptions while other work was being performed on the structure above. Permission to proceed in this manner was refused by the Architect. As a consequence the only remaining method of gaining time is by decreasing the durations of activities. This could be accomplished by any of the following:
1. increasing the manpower
2. working overtime  * * *
3. working double shifts
The architect responded to these statements and some later ones in correspondence related to the same subject by memorandum dated May 11, 1967, addressed to Director of New Facilities at Rutgers, with copies to all contractors and the CPM consultant. In relevant part the architect stated:
I have responded on three previous occasions to the proposal to re-organize and re-schedule the entire Basement slab and subgrade work sequences for the Faculty Wing:
*395 1. At the 4/26/67 Job Meeting, where I said instantaneously, NO, because of the delays which would then be caused the other Contractors.
2. To Briscoe's Austin P. Welle's telecon to me at 9:45 AM on 5/5/67, when he at first suggested the re-doing of matters in the Teaching Wing, and then realized that he was not stating his true intentions, withdrew the reference to Teaching Wing, and substituted the Faculty Wing. I said NO, and told him that agreement had been reached among all Contractors on a previous basis, they had so mobilized, and that such could not now be changed unilaterally by Briscoe. He asked if he could make contacts with the other Contractors to sell them on the idea of a change in sequence, and I said "it's a free country, but the job is already organized one way and shouldn't be changed."
3. At the 5/10/67 Job Meeting, where I said NO, because Dobson and Broadway would be effectively prevented from even starting their major efforts for several months, and Boro's major start would be even further delayed. Mr. Jones said he would consult with Dobson and Broadway and Boro to pinpoint the differences between the two major modes of operation.
From what I can see inherent and implicit in Mauchly's 5/11/67 letter, and the very serious claims for delays already received from Dobson and Broadway (and which I have stated as being solely Briscoe's responsibility to date, with regard to delays in field work), it seems quite apparent that NO CHANGE IN SEQUENCE should be permitted, else Briscoe's responsibilities (which are now so clear to all concerned) will be thoroughly diluted and diffused, the Contract-busting will then be complete, with you and Mr. Swink and the Board of Governors left to pick up the pieces.
The CPM should not be permitted to be used to beat the Owner nor the architect about the ears, nor as a device to let the CPM Consultant hide behind, but solely as a system of applied intelligence to get the job done on time by pointing out who's holding job progress up.
Briscoe is adjudged by this office to be solely and completely responsible for all field delays to date, which are now reported by your CPM Consultant as of 5/11/67 as 14 weeks; this would currently come to 14 x 7 x $200 = $19,600. per General Conditions Par. G4-F.3, Liquidated Damages, payable by Briscoe to the Owner.
The court finds that the architect did not deny permission to the contractors but did recommend against changes for the reasons stated. The court further finds that the architect recognized that the contractors had the right to agree among *396 themselves as to what to do. The language is strong, but Briscoe was not an unsophisticated contractor.
The architect was under a duty to advise as to the progress of the work. He testified that he did not rely upon the CPM updates for that, but considered them. He testified that he used the percentage of work completed in approving requests for progress payments, as well as his own independent checks of field work.
The court concludes that the architect was not an agent of Rutgers.

C. RUTGERS
The court stated that Briscoe, Dobson, and Broadway had each urged in pretrial briefs that Briscoe had no duty to coordinate the work under the contract documents. The argument was premised on the lack of privity of contract with each other and that privity only existed with Rutgers. They also urged that Rutgers was the only party that could withhold funds from a contractor or terminate a contractor; hence, Rutgers had practical control in the same sense a general contractor has control of subcontractors.
[After referring to correspondence from Briscoe to others, in which Briscoe stated it had control, the court concluded that the delegation of coordination to Briscoe was valid and did not violate public policy for the reasons heretofore stated. The court found that the parties intended Briscoe to coordinate the work from the start.]
The court finds that at the time the contracts were formed the parties intended that Briscoe was to coordinate the project.
The court will consider the following questions in the order stated: (i) Did Rutgers in the contract documents specify that Briscoe was to coordinate the work? (ii) If it did, were the parties by their respective contracts bound by that? (iii) Did the parties by their conduct change that provision?

*397 (i)
Broadway argues that time was made of the essence (G4-F.1), 700 days was the limit (G4-F.4(e)), the work was to proceed without interruption (paragraph SECOND of the Form of Agreement), the rate of progress was an essential condition, (G4-F.2(a)), all work was to be done in accordance with the rate established in the working plan (G4-F.4(c)) and the CPM Consultant was to keep the working plan updated (G4-F.4(d)).
If a contractor failed to complete within the specified time, Rutgers could assess liquidated damages. G4-F.3. The sole exception to this rigid schedule was where a contractor was delayed without fault, as described in G4-D.6 and was entitled to an extension of time.
In its post-trial brief Broadway states:
The significance of the foregoing paragraphs lies in the fact that it is quite clear that Owner, Rutgers, was solely responsible for maintaining the progress of the work. In no way was the contractor for general construction (Briscoe) even implicitly delegated the task of maintaining the progress of work. Nothing in G4-N `General Contractors Special Responsibilities' indicates that Briscoe was responsible for maintaining the progress on the job. In fact, the General Contractor is not even mentioned in any of the clauses dealing with the time and scheduling on the job.
Broadway then refers to Rutgers power to terminate a contractor (G4-D.5) and to withhold monies if one contractor's acts delayed another under G4-D.1(f).
Broadway then urges that Rutgers as the owner was the only party which could have enforced the CPM schedule, citing L.L. Hall Constr. Co. v. United States, 379 F.2d, 559, 177 Ct. Cl. 870 (1966); R.H. Baker Co. v. State, 267 App. Div. 712, 48 N.Y.S.2d 272 (App. Div. 1944), aff'd 294 N.Y. 698, 60 N.E.2d 847 (Ct. App. 1945), and that its failure to enforce the schedule and cooperation was a breach of the contract, Hoffman v. United States, 340 F.2d 645, 166 *398 Ct. Cl. 39 (1964); John A. Johnson and Sons, Inc. v. United States, 180 Ct. Cl. 969 (1967).
Broadway urges that Rutgers' duty to coordinate was not a token duty. L.L. Hall Constr. Co. v. United States, supra; Shalman v. Board of Ed., Cent. School Dist. No. 1, 31 A.D.2d 338, 297 N.Y.S.2d 1000 (App. Div. 1969); Forest Elec. Corp. v. State, 30 A.D.2d 905, 906-07, 292 N.Y.S.2d 589, 591 (App. Div. 1968).
Dobson in its post-trial brief urged basically the same points as Broadway on this issue but emphasized the provisions of G4-D.1, Separate Contracts, and G4-D.2, Mutual Responsibility of Separate Contractors. It points out that under the latter provision:
If, through acts or omissions of the Contractor, any other contractor * * * shall suffer loss or damage on the work, the Contractor agrees to settle with such other contractor * * * if such other contractor * * * will so settle * * * If such other contractor * * * shall assert any claim or bring any action against the Owner * * * the Contractor * * * shall defend, indemnify and save harmless the Owner * * *,
and hence concludes that the owner expected to be sued for the defaults of contractors.
Dobson cited basically the same cases as Broadway.
State urged that under G4-N Briscoe was given and accepted the responsibility of coordination and allocated $425,659 in its bid to carry out that work.
Under G4-N General Contractor's Special Responsibilities of the General Conditions, it is provided in relevant part:
G4-N.1 UNIQUE ROLE OF RESPONSIBILITY: STAFFING: The General Contractor has the responsibility for being the supervisor, manager, overseer, coordinator and expediter of all of the Contractors and of the total construction process and all of its parts, in accordance with the Contract. * * * [Emphasis added]
The provisions of G4-N.2, Owner's Reliance Upon General Contractor, and G4-N.3, Other Contractors' Reliance upon General Contractor, are set forth supra at 367.
*399 Contrary to Broadway's assertion that the contractor for general construction was not even mentioned in G4-F, Time and Scheduling, it is mentioned, as noted earlier, in G4-F.4, which in pertinent part states:
* * * General Contractor shall incorporate and enforce the combined schedule as his own. Each Contractor agrees to cooperate and coordinate his own operations in order to meet effectively all schedule task deadlines. [Emphasis added]
As the court stated before, there is no "General Contractor." Based on a review of the provisions of the General Conditions, particularly G4-N, the court concludes that any reference to General Contractor was an error that misled no one, and in the context of this case meant the contractor for general construction.
Despite the assertion of Dobson and Broadway that there was no privity of contract among the contractors, Broadway states in its post-trial brief, in explaining why the provisions of G4-D.1(f) (authorizing Rutgers to withhold monies from a contractor which delayed work under certain circumstances) are binding on all parties:
* * * Since all contractors received the same contract, all contractors agreed to pay the costs of the non-delaying contractor's damages in that they authorized the owner to deduct those costs should they be at fault for the delay, G-4-D.1f.
The court agrees with the quoted statement. In particular, the General Conditions of all contracts are identical. Certainly the provisions of G4-F, Time and Scheduling, must be identical in all contracts and binding on all parties to the contract, as are all the other relevant General Conditions.
The court interprets the common provisions of G4-F to mean that after Briscoe and the other contractors, including Dobson and Broadway, developed the post-bid schedule using their combined logic, and agreed upon it, then Briscoe agreed that the combined schedule was its own schedule. The others, *400 including Dobson and Broadway, expressly agreed to cooperate with Briscoe and to follow the combined schedule which was to control the project. G4-F.4(c).
When these provisions are read in the light of the fact that Briscoe had to build the forms into which the concrete was to be poured, which concrete when cured was the base upon which all other work was to be performed, the court concludes that Briscoe was in a practical position to set the pace and to determine how the other contractors were to preform, except Rutgers in respect to OFE.
Based on the cases cited by Dobson and Broadway, none of which involved a CPM schedule, the court construes their argument to be that as among the contractors there had to be some person who could compel a recalcitrant contractor to adhere to the schedule where one contractor breached the duty to cooperate. The strongest support for this view is found in Hoffman v. United States, supra.
In that case the Federal Government undertook a project on a river which required the relocation of a highway bridge and a railroad bridge. In respect to the highway bridge, the State of Oregon was given a contract to relocate the bridge and in turn let a contract to a private contractor to do the work. The new highway bridge was to be 68 feet upstream from the new railroad bridge. It was anticipated that work would proceed on both simultaneously.
Oregon awarded its contract first. The private contractor proceeded to construct a coffer dam on the eastern side of the river which had the effect of diverting and concentrating water on the western side so that it flooded the area where the abutments for the railroad bridge were to be built.
Conventional engineering practice suggested a series of small coffer dams be built with a connecting walkway, so that there would be no concentration of water and the river would flow normally.
The second contractor applied for "an equitable adjustment" on the ground that there was a change of conditions. *401 The contracting officer and Board of Contract Appeals denied it. They said that the contractors were under a duty to cooperate and had to work out the problems among themselves, and that the contracting officer lacked authority to compel them to act. The court reversed.
Under Article 3(b) of the contract between the United States and the State of Oregon it was provided, in relevant part:
b. The state * * * shall carefully fit its own work to that provided under other contracts as directed by the Contracting Officer. The State shall not commit or permit any act which may interfere with the performance of any such work by the Government and/or Government contractor. [Emphasis added]
The court said that the second contractor was confronted with a situation it could do nothing about. The contractors were independent of one another except for the common provision for cooperation. In such a situation the court concluded that the contracting officer had express authority to compel action and had failed to exercise that authority. After default of any attempt to compel cooperation, the contracting officer could not disavow "all responsibility on the part of the Government to direct or require cooperation." Id. 340 F.2d at 650-651.
In L.L. Hall Constr. Co. v. United States, supra, the court reversed the denial of award to plaintiff for damages due to performance over an extended period of time and total shutdown of its work for several months. Plaintiff was one of several contractors on a project to repair and stabilize four runways at a naval air station. The Government had not made available certain runways because other contractors were working on them. The court found that the Government had failed to supply material to some of those contractors and had caused delay, but had also given preference in other areas to contractors who neither needed nor deserved it.
*402 * * * where the Government unreasonably hinders or delays a contractor's performance, even though it does not prevent the eventual completion of the contract, it has breached its implied obligation not to delay the contract, in the absence of a clause expressly exempting it from such liability. Further, it is clear from the United States v. Howard P. Foley Co. [329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44] and George A. Fuller Co. v. United States [69 F. Supp. 409, 108 Ct. Cl. 70] cases, supra, and others cited, that defendant is not liable for delays which it did not cause, over which it had no control, or delays encountered by a contractor notwithstanding defendant's diligence in performance of its responsibilities under the contract. Thus, the questions on which liability turns in this case are whether defendant was the cause of the delays here, whether it failed to use reasonable diligence and good faith in performance of its responsibilities under this contract, and whether the contract contemplated and excused the delays.

* * * * * * * *
Noting the absence of evidence to excuse the delay, the court assumed lack of an excuse and held the Government responsible for damages sustained by plaintiff caused by delay.
In R.H. Baker Co. v. State, Forest Elec. Corp. v. State, and Shalman v. Board of Educ. Cent. School Dist No. 1, all supra, the courts applied the law of New York under which the State and its subdivisions, except where a statute expressly authorized a different result, are held to have a non-delegable duty to coordinate contractors and progress the work. Careful review of these cases reveals that the party hiring the complaining contractor had either the express power to coordinate or the power resulted from legislative policy.
Under the contract in question Rutgers bargained for the structures to be built in accordance with plans and specifications and within a stated time. However, Rutgers did not state how the contractors were to do the job. For example, Rutgers did not state that the contractor for general construction had to have two cranes, sufficient forms to build the four towers simultaneously, or that the electrical contractor had to have all light fixtures in storage on site before *403 commencing installation, or the plumbing contractor had to have a field force of a specified number at any time.
Instead, under G4-F after the contract award, the contractors, with the aid of the CPM consultant, were to determine what components of equipment, such as hoisting equipment and forms as well as manpower, would be used to get the work done within the allotted time period, subject to such limitations as curing time for the concrete in the specifications. Their combined effort was to produce the schedule to perform consistent with the logic of their respective works. This gives rise to a contract right among themselves, for they are the only ones involved in the process.
In Natkin & Co. v. George A. Fuller Co., 347 F. Supp. 17 (W.D. Mo. 1972), Western Electric Company (owner) intended to build a manufacturing plant. It entered into a series of contracts with the various trades  mechanical, electrical, etc.  and with defendant as general contractor. It assigned to the general contractor all its contracts so that defendant was in the position of a general contractor. The court found:
Under the various contract documents, it was provided that a Critical Path Method of scheduling would be followed by all parties throughout the job, and the general contractor would be responsible for preparing the original logic diagram therefor, maintaining it current based on designated criteria, and providing computer printouts as required by said criteria. [at 30]
Defendant there, in cooperation with plaintiff, did prepare a CPM arrow network diagram and schedule for completion of the project within the allotted time. When defendant general contractor fell behind and the owner wanted certain office structures completed by a certain date, the court concluded that the owner took control of the project and abandoned the CPM schedule. The resultant effect of that abandonment was to change the completion date for various portions of the work without regard for the impact those changes had on the execution of Natkin's contract. See Id. at 21.
*404 The court held Western Electric and George Fuller liable, finding that Western Electric, as owner, had assumed active control of the project and had ignored the paper delegation of control to George Fuller. It also found that Western Electric had ordered Natkin to do work out of sequence.
Stated in general terms in the context of this case, the contractors, when they gave their input to the CPM consultant to develop the arrow network diagram and the CPM schedule which is but a reflection of that diagram, to do the project based on their logic, essentially agreed with one another that the work would be performed in that manner, sequence and time.
Just as Western Electric had no right to disrupt Natkin's contractual rights under the CPM provisions, Rutgers had no right to disrupt any of the contract rights under the arrangements worked out for doing the work, except as provided in G4-F.1 et seq.
In Great Lakes Constr. Co. v. Republic Creosoting Co., 139 F.2d 456 (8 Cir.1943), plaintiff contracted with the United States for construction of a postoffice and subcontracted with defendant to install the finished wood flooring. To permit continued operations at the existing postoffice, the new postoffice was to be built in two units. To coordinate the work of its subcontractors plaintiff established scheduled commencement and completion dates for them. Under this schedule flooring for unit 1 was to be complete December 1, 1936 and for unit 2 was to be complete January 1, 1938. In January 1936 plaintiff told defendant that flooring was needed in the fall of 1936 but access not given until June 17, 1937. On January 1, 1937 union scale went up and the cost of materials went up for flooring contractors. Defendant concluded that the delays were such that similar problems would exist for unit 2; hence, it refused to proceed without an increase in price.
The procedural history of the case involved United States contract laws. The court allowed recovery on defendant flooring contractor's claim. The court stated:
*405 [I]t is equally obvious that a contract to construct the flooring in a building implies timely provision of the situs for its location. The failure of Great Lakes to have the building ready for the flooring fully justified Republic's refusal to proceed and Great Lakes clearly recognized the refusal and accepted it by buying the material and undertaking to do the work itself. There was, as properly found by the trial court, an abandonment of the subcontract, and the acceptance of the work and material furnished by Republic upon the understanding detailed in the findings justified and required the recovery upon the quantum meruit which was awarded. Guerini Stone Co. v. Carlin Construction Co., 248 U.S. 334, 39 S.Ct. 102, 63 L.Ed. 275; [Id. at 464]
See also, Johnson v. Fenestra, Inc. (Erection Div.) 305 F. 2d 179 (3 Cir.1962) (general contractor held liable for delay imposed on subcontractor where general contractor was scheduling work.)
The provisions in the respective contracts whereby Rutgers had power to terminate a contract and to withhold monies under certain circumstances, did not give Rutgers power to coordinate the work. To so hold would mean that where an owner under a regular general contract for construction of a building reserved the power to terminate the general contractor, or to withhold certain monies to pay subcontractors under stated conditions, then such owner was under an implied duty to coordinate and progress the work, Such a result would defeat the very purpose an owner has in entering into a general contract, to escape the responsibility of coordination and progression of work as well as consequent liability. Compare Stehlin-Miller-Henes Co. v. Bridgeport, supra, with cases collected in Annotation, "Delay  Prime Contractor's Liability," 16 A.L.R.3d 1952 (1967).
In Federal Surety Co. v. A. Bentley & Sons Co., 51 F.2d 24 (6 Cir.1931), the surety of a plumbing and heating subcontractor of the general contractor to construct a 29-building hospital sued to collect $86,942.90 due on the subcontract which the surety completed following the default of the subcontractor. The general contractor claimed a right to offset, because the subcontract in respect to installing *406 the boilers, steam pipes and trenches to carry the steam pipes were not completed within the agreed-upon time to provide temporary heat for use during the winter. The surety conceded that certain provisions of the general contract were incorporated into the subcontract. The subcontract, in § 4, provided that the work was to be done under the "jurisdiction and control of the contractor, the Quartermaster General of the Army, or such contracting Quartermaster as he may designate." The surety conceded that this required that the subcontractor had to carry on its work in conformity with the general course of construction. The specifications of the general contract incorporated by § 29 of the subcontract provided that the main boiler house could be used as a source for temporary heat.
The time for completion of the subcontract was 16 months. After award of the subcontract the general contractor directed that the boiler house be completed within seven months so as to be able to use it for temporary heat.
The surety urged that the power to supervise was subject to a requirement of reasonableness, and it was unreasonable to direct the substantial portion of the contract in seven months when the contract allowed 16.
The court found that, in response to the general contractor's direction to complete, the subcontractor not only acquiesced but boasted of its ability to meet the time deadline. The court further found that the seven-month period was a reasonable period to do the work. Taking into consideration the general contractor's supervising role and the parties' construction of the contract, the court concluded that the subcontractor was responsible for delay damages. Id. at 26.
From the foregoing cases emerges the principle that where contractors among themselves agree that segments of the work to complete a project shall be done by certain dates in order to complete a project for an owner by a stated date or within a stated time, then the contractor which fails to perform on time is liable in damages for breach of contract, *407 whether the contractor have overall supervision, see Great Lakes Constr. Co. v. Republic Creosoting Co., supra, or the contractor is responsible only for a portion of the work, see Federal Surety Co. v. A. Bentley & Sons Co., supra.
The effective means of enforcing the contract is not the ability to withhold funds or to terminate, but to sue and to enforce according to the remedies provided by law. Fortunately, most contractors honor their commitments or the courts would be overwhelmed.
Based on the cases last cited, the reasoning set forth in Broadway's brief quoted above, the provisions of G4-F.1 et seq., and for the reasons set forth above, the court concludes that the contractors among themselves agreed in the contract documents that Briscoe was to coordinate the work.
The court agrees with counsel for Broadway that State's contentions that Buchman Plumbing Co. v. Regents of the Univ. of Minnesota, 298 Minn. 328, 215 N.W.2d 479 (Sup. Ct. 1974), held one multi-prime contractor could sue another multi-prime contractor for delay on a third-party beneficiary concept is unwarranted by the result and the facts of that case.
In Buchman the University let multi-prime contracts which were not identical, but each did contain the following provision:
Article VIII
"The Owner [University] agrees to provide all labor and material essential to the conduct of this work not included in this contract in such manner as not to delay its progress, and in the event of failure so to do, thereby causing loss to the Contractor [Buchman], agrees that it will reimburse the Contractor for such loss; and the Contractor agrees that if he shall delay the progress of the work so as to cause loss for which the Owner shall become liable, then he shall reimburse the Owner for such loss."
The contract set a time period of 200 days for performance. Following completion beyond the 200-day period, Buchman sued the University and the general contractor for money damages. In respect to the general contractor, Buchman urged, *408 the former's performance of its contract to provide the building on time to the University was intended to discharge the University's obligation to provide the building under Article VIII and, since it was late, Buchman could recover damages as a third-party beneficiary.
The court pointed out that the University was not relieved from liability to Buchman by reason of the action of the general contractor. The court held that Article VIII was intended for the benefit of the University and not Buchman. The court concluded that, as to the general contractor, Buchman was at most an incidental beneficiary.
New Jersey has long recognized and enforced third-party beneficiary contracts. See N.J.S.A. 2A:15-2. See also, Drewen v. Bank of Manhattan Co. of N.Y., 31 N.J. 110 (1959); Werner v. Kent Parking Garage, Inc., 133 N.J.L. 104 (Sup. Ct. 1945); Whitehead v. Burgess, 61 N.J.L. 75 (Sup. Ct. 1897).
In the context of this case, the problem arises in respect to the right of a multi-prime contractor to sue another multi-prime contractor for delay in executing a project for a common owner-contractee. The fact of multi-contracts is recognized in G4-D.1, Separate Contracts. Delay is also recognized in G4-D.1(f) which, in relevant part, states:

In case the Contractor, * * * shall unnecessarily delay, * * * the work of the Owner or other Contractors, by not properly cooperating with them or by not affording them sufficient opportunity or facility to perform work as may be specified, the Contractor shall, in that case, pay all costs and expenses incurred by such parties due to any such delays and he hereby authorizes the Owner to deduct the amount of such costs and expenses from any monies due or to become due the Contractor under this Contract * * * [based on Architect's recommendations]  [Italics supplied]
The contractor who suffers delay is specifically referred to. In other sections of the contract, e.g., G4-D.6(b), the delayed contractor agrees to make "no claim for damages * * * against the Owner" but only to request extension of *409 time to complete, G4-D.6(a). The parties intended to relieve the owner from liability for delay damage by having the contractor who caused the delay pay the damages. This language is directed to the situation where one contractor forces others to sit by, idling their forces.
Conversely, if to make up for lost time due to a contractor's own actions, then under G4-F.4(d) the owner may order the other contractors to accellerate and pay them the added costs, and "the Contractor responsible for the delay shall be liable for and shall pay to the Owner the additional expenses connected therewith." However, a careful reading of G4-F.1 requires the contractors to agree to the changes and does not permit Rutgers to unilaterally order changes, i.e., if Briscoe agreed to the use of a second crane to speed up, then Rutgers could finance the added costs of Dobson and Broadway to meet the accelerated pace and look to Briscoe. This language is directed to the situation where the one contractor forces the others to act in a shorter period of time than envisioned  acceleration. In both situations the contractor causing the delay was to ultimately bear the cost of delay or to cure it when borne by others.
The undertaking of the delaying contractor to agree to a change in G4-4(d) does not make the promise illusory because if such contractor elects the only alternative, i.e., not to change its work, then it suffers the detriment of paying damages to the delayed contractors.
[I]f the performance of every alternative open by the terms of a promise involves a detriment, the promise will be a sufficient consideration. [1 Williston, Contracts (3 ed.), § 104 at 401]
The authority of Rutgers to withhold monies for delay damages in the first setting is not intended to set a limit on the dollar liability of the delay contractor; i.e., the delayed contractors can only recover so much as Rutgers owed to the delaying contractor. If this does not set a dollar limit, then the only means the delayed contractors have of enforcing this *410 promise to pay is by a direct suit against the delaying contractor.
The fact that the specific contractors were not known when the bids were submitted is immaterial. Whitehead v. Burgess, supra. The fact that there was no privity of contract is also immaterial. See Id.; Werner v. Kent Parking Garage, Inc., supra (tenant had cause of action against third party which had contracted with owner-landlord to provide heat in building where landlord expressly disavowed its duty to provide heat in lease with tenant).
Although on the facts the court in Buchman did hold that the general contractor was not liable, under the tests set forth therein for a third-party beneficiary contract the standards are met. The tests are summarized.
In determining whether the necessary intent to benefit is present, many courts have inquired: To whom is performance to be rendered? Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 178 N.E. 498 (1931); Fidelity & Deposit Co. v. Rainer, 220 Ala. 262, 125 So. 55 (1929); Grismore, Contracts (Rev. ed.) § 238; Simpson, Contracts (2 ed.) § 117; Note, 57 Col. L. Rev. 406. If, by the terms of the contract, performance is directly rendered to a third party, he is intended by the promisee to be benefitted. Otherwise, if the performance is directly rendered to the promisee, the third party who also may be benefitted is an incidental beneficiary with no right of action. Simpson, Contracts (2 ed.) § 117.
Minnesota also appears to require that the promisor's performance discharge a duty owned by the promisee to the third party. In Northern Nat. Bank v. Northern Minn. Nat. Bank, 244 Minn. 202, 209, 70 N.W. 2d 118, 123 (1955), this court stated:
`* * * A creditor beneficiary is defined as one to whom the promisee owes or is believed to owe a duty which is discharged by the promisor's performance.' [Emphasis supplied]
In Crow & Crow, Inc. v. St. Paul-Mercury Ind. Co., 247 Minn. 426, 428, 77 N.W.2d 429, 431 (1956), this court said:
`A third-party beneficiary is one to whom the promisee owes or is believed to owe a duty which is discharged by the promisor's performance, and the contractual right the third-party beneficiary acquires is to enforce a promise made for his benefit which he otherwise would not be able to enforce.' (Italics supplied).
See 2 Williston, Contracts (3 ed.) §§ 356A, 361; Corbin, Contracts (1 Vol. ed.) §§ 774, 787.
*411 If Rutgers held insufficient funds from a contractor causing delay to satisfy the amount of damages attributable to delay, the contractor suffering such damages is not barred from enforcing the delaying contractor's promise to pay. The fact that Rutgers recognized that it might be sued by the delayed contractor and provided that the delaying contractor indemnify it against such claims is neither an admission of liability nor a basis of imposing an implied obligation to pay. The result should be no different if Rutgers withheld no monies from the delaying contractor.
Based on the foregoing analysis, including the enforceability of delay damages directly against the delaying contractor, either as express promise based on the reasons quoted from Broadway's brief and the reasons set forth above, or a third-party beneficiary concept as set forth above, the court concludes that Rutgers and the other parties specified that Briscoe had the duty of coordination and had the means to enforce it.

(ii)
Even though the contracts with Rutgers were executed separately, each provided in paragraph Eighth of the form of agreement, see page 373 supra, the General Conditions are part of the contract.
Broadway in its brief correctly urged that where one contractor agrees to pay damages to another and also authorizes the Owner to withhold such sums, then there is an enforceable duty against the other contractor because of the incorporation of reciprocal provisions. See KEC, supra.
In the context of a multi-prime contract for a construction project to be executed on a critical path method, or other similar technique, where the successful contractors are to determine how the work is to be done within the allotted time, the necessity for mutual obligations among such contractors is evident. The contract documents under G4-F.1 et seq., G4-D.1 et seq. and G4-N.1 et seq. make it explicit.
*412 The court concludes that all contractors and Rutgers were bound by the provisions that Briscoe was to coordinate and to progress the work.

(iii)
The court finds that during the progress of the job Dobson and Broadway registered constant oral complaints about Briscoe to the architect. This is evident from the testimony. The court finds it to be so.
The architect in numerous letters to Briscoe complained about Briscoe's failure to coordinate the job. This is established in the exhibits.
Except in the case of pipe inserts, which is treated hereinafter, neither Dobson nor Broadway complained to Briscoe. The court does not find any evidence that either made any demand upon Briscoe for it to use concurrent operations, additional manpower or equipment, etc., to speed up its work.
Unlike Western Electric in Natkin, Rutgers did not take control of the project. Indeed, Dobson and Broadway predicate this action on Rutgers' failure to take control and to intervene in the rights worked out among the contractors.
The court finds that Rutgers did take affirmative action to explore ways to move the project forward. It did have a complaint drafted against Briscoe to compel specific performance of its obligation to provide temporary heat. The complaint was not filed because Briscoe in the courthouse agreed to perform. But Rutgers' action here was motivated as much to protect the completed work from freezing damage as it was to assist Dobson and Broadway.
Rutgers did receive a special report of the CPM consultant suggesting ways to rearrange the sequence of work by leaving basement area during backfill problem and doing plumbing and electrical work on upper structure and then returning. Some of the reasons why this was not done have already been set forth.
*413 Rutgers, the architect and Briscoe met on one occasion in April 1968 to discuss means of speeding up the tower work. Exhibit D-33 is a purported summary of that meeting. In relevant part it states:
It was generally agreed that completion of the Faculty Wing towers was presently a key item, as affecting precast panel erection, availability of mechanical equipment rooms and toilets for the mechanical trades, and especially installation of elevators. Mr. Rea expressed his view that the presently forecast (by Briscoe) date of September for completion of the towers was too late, and that at present rate of progress even this date would probably not be met. Additional forms or form-time availability should be provided to cut down the amount of moving and total forming time from tower to tower and increase the rate of pouring.
Mr. Helle and Mr. Kinney replied that the cost of additional forms was prohibitive, the Pecco crane was too busy now to handle any additional work load, and the cost of a 100-ton crawler crane need to take care of the forms would balance out any possible saving achieved by earlier release of the Pecco crane. They believe the September date can be met considering that on completion of the 8th floor and roof slab very shortly, that crew can be swung over to the towers.
It also reflected that the architect presented a scheme for cutting the number of tower wall joints and concrete pours in half. Although Briscoe had rejected it a year earlier, Briscoe agreed to study this proposal again.
There was also discussion about the need for the elevators and hoisting. There was discussion of the material hoist. There was discussion of the need for the permanent heating plant for the winter of 1968-1969. The only definite agreement was to meet in three to four weeks. Even this was not done. The court concludes that Rutgers did not assume control of the project.
Because the parties did not change the logic of the network, Broadway had its damage expert on the site, Rutgers adhered to its basic position, and Dobson and Broadway filed letters asserting damage claims, the court concludes that all the parties proceeded with the project intending to claim damages rather than asserting breach as a ground of termination. *414 This procedure is not contrary to law. Sheehan v. City of Pittsburg, 213 Pa. 133, 62 A. 642 (Sup. Ct. 1905).
The court concludes that the parties did not modify the terms of the contract in respect to coordination by their conduct.

2 and 3

What is Meaning of the Exculpation Clauses for Rutgers?
[The court here stated that its conclusions to this point resolved all matters covered by issues 2 and 3 other than the meaning of the exculpation clauses.
[It referred to paragraph Seventh of the form of agreement, supra at page 373, and G4-D.6(b), supra at page 375 each of which stated that no claim for damages could be asserted against Rutgers other than for extensions of time by reason of any of the delays mentioned in the contract. It also referred to G4-D.1(e), supra at page 374.
[The court also referred to G4-D.1(f), G4-F.4(d) and G4-D.6(a), supra at pages 370-372, 374-375, and concluded that delays caused by another contractor not properly cooperating with another contractor, and delays caused by acts of another contractor in the performance of a contract with Rutgers, were expressly included within the contract.
[The court concluded that as against Rutgers, as owner, plaintiffs were barred from asserting money damages for the delays caused by the delays expressly covered in the contract and that such clauses should not be construed on a reasonable basis standard. Psaty & Fuhrman v. Housing Authority, 76 R.I. 87, 68 A.2d 32, 10 A.L.R.2d 789 (Sup. Ct. 1940).
[The court then stated that plaintiffs sought to avoid this result by predicating claims for "equitable adjustment" under G4-G.14 and on the judicially created exceptions to such clauses referred to in Ace Stone, Inc. v. Wayne Tp., supra.
*415 [Before considering these contentions, the court reviewed the evidence and concluded that Rutgers had two distinct roles under the contract, one as "owner" and another as "contractor."
[Under Division 15 of the contract Rutgers was to supply 55 items of equipment. This required it to supply the delivery dates, etc., to the CPM consultant post-bid for preparation of the arrow network diagram and computer printouts which were to be part of the working plan. In respect to OFE, court concluded that Rutgers should be treated as a contractor and not as owner.
[The court then considered claims under G4-G.14 which provided:
If the Contractor shall claim compensation for any damage sustained by reason of the acts of Owner or its agents, he shall, within seven (7) days after sustaining such damage, make a written claim and statement to the Architect of the nature of damage sustained. On or before the fifteenth day of the month subsequent to that in which any such damage shall have been sustained, the Contractor shall file with the Architect an itemized statement of the Details and the amount of such damage alleged to have been sustained. The filing of the written claim and itemized statement of details hereinabove provided shall be a condition precedent to the assertion of any claim by the Contractor against the Owner or its agents, and the failure to file such written claim and statement and itemized statement of the details shall relieve the Owner from all liability whatsoever of every kind, character and description for such claim.
[The court reviewed evidence as to assertion of claims during the progress of the work under the contract. Broadway asserted claims for delay, including overhead. The architect and Rutgers contended that claims should be asserted against the contractor for general construction. It noted that no reference was made to G4-F.14 until December 1967, almost 14 months and many claim letters into the job.
[The court also noted that neither Dobson nor Broadway filed any detail with their claim letters as required by G4-G.14.
*416 [The court observed that the architect stated that claims should be sent to the contractor for general construction. See M.T. Reed Const. Co. v. Virginia Metal Prods. Corp., 213 F. 2d 337 (5 Cir.1954). (held, contractor for general construction under multiple prime contracts let for construction of library at University of Mississippi and right to sue directly contractor who was to install metal book cases for delay damages where each contract provided for cooperation among contractors, and that contractor causing delay agreed to settle with contractors delayed. Settle means to pay. Judgment setting aside jury verdict for subcontractor reversed and judgment for contractor for general construction entered on third-party beneficiary theory).
[The court then construed the provisions of G4-G.1 et seq. to apply to financial transactions, change orders, etc. It stated that G4-G.14 could not be construed to impose liability for delay damages expressly excluded under G4-D.1 et seq.
[The court rejected the contentions of Broadway and Dobson that they lacked sufficient information to file proper claims. It stated that the evidence established that the architect had documented his position and decision as to the delaying contractor. The backfill problem and slow pour problems were open and notorious to all.
[The backfill problem arose in connection with the requirement under the specifications that on-site material not larger than 6" be used to backfill around foundation walls, column fittings and pipe trenches below the basement slab in the building. The soil was Brunswick shale. This may be either soft or hard as rock. Dobson and Briscoe encountered it as rock, as was suggested by the soil borings in the bid documents. They elected to blast rather than dig by back hoe. The result was a considerable quantity of material larger than 6".
[A dispute developed between the parties that lasted for months.
[In respect to the slow pouring of the concrete for the main structures and the slowness in the pouring of the concrete *417 for the four sets of towers, the court noted that the plans showed the towers as separate structures.
[The court noted that on the arrow network diagram the activities that controlled the start of the pouring for the towers did not appear on D-13(a) but did appear on D-13(c).
[The court reviewed testimony that Dobson and Broadway expected tower floors to be poured simultaneously with, or at least closely behind, the deck for the corresponding floor in the main structure. The court concluded that this would have required the pouring of the tower floors when the tower walls to support them were four floors behind, and stated that the witnesses were unable to explain how it could be done.
[The court summarized the position of the parties as to the bases for their claims and defenses for delay, disruption and loss of efficiency. Plaintiffs asserted claims on a time analysis, the State on a programmatic basis.
[If stairs were scheduled to be available as of a given date and were not, plaintiffs calculated damages by factors from that date. The State contended that plaintiffs' approach ignored the fact that if the project had proceeded on schedule, the workers of Dobson and Broadway would not have had stairs, elevators, etc., to do much of the work.
[The court analyzed the CPM schedules and concluded that Dobson and Broadway would have had to do much of the work without stairs and elevators. The court concluded that the claims had not been proved.
[The court also concluded that if there were any liability for delay or other reasons, then the contractor for general construction was responsible and Rutgers as owner was not.
[The court found that contractor for general construction was responsible for temporary heat and Rutgers as owner was not.
[The court concluded that each contractor was obligated to supply its own hoisting under contract.
*418 [To the extent that Dobson and Broadway predicate their claim under G4-G.14 upon an implied promise, the court found that there was no basis in law for doing so.
[In 2 Williston on Contracts (Jaeger ed. 1968), § 1295 it is stated:
It is not only for breach of express promises that a contractor is liable but for breach of implied promises as well; and the most serious difficulty in this matter is to determine what promises are fairly and properly to be implied in a given contract:
"The introduction of an implied term into the contract of the parties * * * can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that is absolutely necessary to introduce the term to effectuate the intention of the parties." Id. at 33-36. [Quoting from Brodie v. Cardiff Corp. [1919] A.C. 337]
See Walter R. Cliffe Co. v. DuPont Eng'g Co., 298 F. 649 (D.C. Del. 1924); United States v. Croft-Mullins Elec. Co., 333 F.2d 772 (5 Cir.1964); P. & M.J. Bannon v. Jackson, 121 Tenn. 381, 117 S.W. 504 (Sup. Ct. 1908).
[The court concluded that the concept of "equitable adjustment" was a concept of federal contract law which was employed under circumstances provided for under federal regulations.[10]
*419 [In respect to the judicially created exceptions to the no damage for delay clause the court concluded that since Rutgers was liable as a contractor for delay on OFE, it was not necessary to consider the contention that Rutgers actively interfered by ordering the architect not to process shop drawings for OFE. The court concluded that the parties had not treated the delay as so extensive as to constitute an abandonment of the contract, but on the contrary proceeded under it with the intent of claiming damages. The court concluded that the delays encountered were those specified in and provided for under the ambit of G4-D.1(f), G4-D.2, G4-D.6(a)(b), and G4-F.1 et seq.]
For the reasons heretofore stated, the court concludes that Rutgers is not liable under G4-G.14 for delay damages in monetary terms and that such claims are barred under G4-D.6(a) and (b).

5

Were Claims for Extensions of Time and Other Claims for Money Damages Filed Within Time under the Contract
The record is replete with requests for extensions of time from Dobson and Broadway. Some have been denied, but none have been granted.
*420 The evidence which has already been referred to by the court and its findings thereon shows that Dobson and Broadway were not the cause of delay, except that Dobson contributed to the backfill delay. Since their trades followed the general construction work, this is logical and to be expected.
Insofar as the counterclaim of the State is concerned, it rests solely upon plaintiffs' contention of the time of the overrun. The court finds, based upon the credible evidence in the record as to Briscoe, Blickman, and Rutgers on OFE, and the architect's opinion with respect to Briscoe, that Dobson and Broadway are entitled to extensions of time at least equal to what is necessary to offset the claim for liquidated damages. The State put in no evidence to negate the proofs of Dobson and Broadway on these matters. The court concludes that by the State failing to call the architect to negate their right to such extensions, any informalities have been waived by the State on behalf of Rutgers. Accordingly, the court dismisses the State's counterclaim. Since Rutgers is the technical party, the court awards costs to plaintiffs.
In respect to any liability Rutgers may have for damages as to delay for OFE, the court concludes that there were sufficient timely filings to put Rutgers on notice as to the basics of the claim. The court further notes that there are no stated time periods for filing against a contractor under G4-D.1(f) and G4-D.2. These claims, the court concludes, are outside the scope of G4-G.14. Without reviewing each of the specialized claims in detail until heading 9, the court concludes that Rutgers was given timely *421 notice of them such that they should not be barred on a time basis.

8

What Damages, If Any, Are Recoverable For Delay And/Or Disruption Against Rutgers?
Because of the court's prior disposition of issue 6 (active interference), and because the court has heretofore held that Rutgers is liable as a contractor and not solely as owner for delay damages, there is no need to consider issue 7 or 6 separately. The court therefore considers issue 8.
Dobson's claim based on Rutgers' failure to deliver OFE differs in manner of presentation from that of Broadway's claim based on Rutgers' failure to deliver OFE, although the damage aspect in each case is the same.
PD-10, submitted on behalf of Dobson sets forth in periods of time the period of delay for OFE. In respect to Broadway, McCarthy testified that the damage claim for OFE was not separately stated but was included within the statement of damages attributable to loss of productivity due to disruption of work  i.e., it is not stated as a function of time. Accordingly, the court will consider these claims separately.

(a) Dobson

Pursuant to Division 15 of the specifications of the contract and addendum 7 to the contract, Dobson was to hook up to the plumbing system certain items of equipment which Rutgers was to purchase and to deliver. In respect to this claim, all parties agree that D-13(c) must control because D-13(a) and the pre-bid documents do not show the activities associated with OFE equipment. Indeed, even D-13(c) does not show separately the hookup work but only the delivery dates. In Dobson's proposed findings of fact 109, 110 and 111, it is conceded that PD-10 was incorrect *422 in that it was based on early finish dates whereas Rutgers had the right to use late finish dates for the delivery of OFE.
There is no claim that certain OFE items which were installed in the basement did not delay completion of the job. They had to be installed before the masonry walls were sealed up in the basement.
The thrust of the claim is based on those items reflected in activities beginning at XXXX-XXXX and continuing to XXXX-XXXX in the Faculty Wing and 1355-133 and continuing to 1374-562 in the Teaching Wing.
The architect testified that the delivery of the OFE did affect the work of Broadway and Dobson, because it was delivered piecemeal and not according to schedule. He further expressed the opinion that they had not been seriously affected. He testified that Rutgers had hooked up some OFE with its own crews but that this was insignificant.
[The court here summarized the testimony and documents concerning delay and the sporadic manner of delivery of the OFE. It found that for a substantial portion of the period of delay, calculated on a time basis, there were delays attributable to other contractors. It also found in the relevant period when Dobson did hookup work on OFE, after other causes of delay were no longer operable, that Dobson was also doing punch list work. The court found that Dobson had minimal manpower and supervision. It concluded that Dobson sustained disruption damage and not delay. By disruption the court meant that Dobson had to send workers to each piece of equipment as it became available and take them from other work, but that Dobson by this activity in and of itself was not delayed in completing the job.
[In respect to piping work in the laboratories, court found that Dobson had agreed to do the work in a manner that required it to send crews in three times instead of twice. It did this work at the request of the architect with the knowledge of, and at least the acquiescence of, Rutgers to accelerate the work, and after Dobson explained that extra cost was involved and it expected to be paid. The court concluded *423 that Rutgers was obligated to pay for this under G4-F.4(d) (acceleration).]

(b) Broadway

As previously stated, Broadway was adversely affected by the late and piecemeal delivery by Rutgers of OFE. However, the damages are included in those related to disruption and loss of productivity according to McCarthy's testimony and the supporting damage exhibits.
The nature of the hookup work to OFE was the same as that done by Dobson.
Significantly, there is not a separate breakout by time span by Broadway for delay. Marks agreed that D-65 a, b and c correctly set forth the dates upon which Rutgers accepted portions of the buildings. This series shows that substantial acceptance was complete by August 21, 1970, subject to punch list items issued about August 17, 1970. The record also establishes that Broadway received almost complete payment on the contract price prior to that date. Broadway, by amendment at trial, limited its claim to 29 months' delay based on all causes to February 1971, except for interest on retainage, rather than July 1971.
In addition to delay due to OFE, Broadway has referred to a delay due to the architect's alleged delay in approving the lighting fixtures. Broadway presents separately a claim for added costs for material due to this delay and changes in underwriting standards. The court will deal with this in the Appendix [not reproduced here] because it involves review of extensive correspondence and certain change orders which were approved and paid. However, Broadway does not separately state a claim for added costs for doing the actual installation work or disruption in doing it.
Since the certified payrolls are in evidence, as well as the Rutgers daily reports, the court concludes that Broadway should be allowed to submit a claim under G4-D.2 against Rutgers for disruption in doing the hookup for the 55 items of OFE.
*424 In respect to delay claims associated with lack of roughing-in drawings, the court finds this testimony highly questionable, based on demeanor, lack of ability to recall seeing certain drawings (D-61 used on cross-examination), and confusion with shop drawings. The question arises in the light of the fact that no one testified that any workman ever had to go back to make a correction because of erroneous placement of a line or connection, with the exception of one piece of equipment in the basement where a drain was involved. The chance possibility of doing such excellent work without drawings is so remote that the court does not find the testimony credible.

Claim Based on Rutgers' Breach Of G4-D.1(f) By Settling With Briscoe and Releasing Retainage.

Although no formal motion was made under R. 4:9-2 to amend the pretrial order to assert the claims based upon Rutgers' failure to withhold monies due Briscoe under G4-D.1(f), supra at pages 374, 381, the court will consider the claim.
Under that section the owner is authorized to retain from a Contractor which delays another the amount of all costs and expenses incurred by the delayed contractor "based on the investigation and recommendation of the Architect." Hence there was a condition precedent to Rutgers withholding funds  a determination as to what the costs and expenses incurred were.
There is no evidence that either Broadway or Dobson ever made a demand for such an investigation and recommendation during the performance of the contract, except for Dobson's claim for draining and refilling the domestic water system discussed hereafter. The documents in evidence, some of which have heretofore been referred to, state that neither could supply the requisite information.
*425 At trial neither Broadway nor Dobson even attempted to establish what dollar amount Rutgers should have withheld from Briscoe in respect to this claim.
The court construes said section as requiring the delayed contractor to request a determination to be made by the architect, during which process the delaying contractor would have the right to at least know what the claim is and the basis for it. The architect would then recommend to the owner what action to take. In the absence of any showing of compliance with said provision, Rutgers was under no duty to withhold an undetermined amount of money. Indeed, even at the pretrial and the period before trial preceding settlement by the State with Briscoe, Broadway and Dobson steadfastly maintained that they had no basis of a claim against Briscoe.
The court concludes that Rutgers and/or the State did not breach this provision of the contract. The court further finds that there is no proof of damages by either Broadway or Dobson on this claim.

9

Specialized Claims
The court will consider Dobson's claim for pipe inserts and draining and refilling the system first. In respect to these claims, Rutgers asserted claims for indemnification against Briscoe, and Briscoe participated at the trial as to these claims. Following trial, Briscoe settled these claims with Rutgers.

Pipe Inserts
Dobson claims it is entitled to $23,489 on this item. This claim was reduced in amount at trial because of errors in wage rates.
Under Division 3, § 3C.9(a) of the contract, the contractor for general construction was to embed in the concrete to be cast in place inserts for the piping of the plumbing *426 contractor which was obligated to furnish the inserts to the contractor for general construction together with location drawings. Division 15 § 15A.19(c)(6) as amended.
However, the CPM printouts listed activities "sleeves and inserts" as being performed by plumbing and mechanical contractors. Sleeves were work to be done and that was done by Dobson.
There is no dispute that Dobson never furnished any inserts or location drawings to Briscoe. Instead, Dobson purchased the inserts and had personnel on its payroll place the inserts in the forms built by Briscoe. Sleeve work is different. It entails cutting a larger pipe to permit a smaller pipe to pass through it. A sleeve is inserted in a masonry wall such as a foundation wall. Work on a sleeve requires fabrication as well as installation.
About the time the Faculty Wing structure was at the seventh floor level and the Teaching Wing structure was nearing completion, Dobson discovered that the contractor for general construction was to provide the labor to install the inserts.
An insert is a fabricated metal unit that is in the shape of a rectangle with flanges flaring out on each side of the top. It is fastened to the forms into which concrete is to be poured in such a manner that its bottom will be flush with the concrete which forms the ceiling. When the concrete hardens and the forms are removed, a pre-cut metal slug is punched out to create a hole in the insert into which hole pipe hangers are inserted to support pipes.
In PD-37 the architect interpreted the specifications as requiring the contractor for general construction to do this work. In PD-38 Briscoe did not accept the architect's interpretation and stated that Dobson had never furnished location drawings. The dispute continued despite directions from the architect. In PD-40 Briscoe reiterated its position and concluded with the following paragraph:
*427 * * * we should also point out at this time, if we are directed to perform the work, we will assign the work to carpenters. This could possibly lead to a jurisdictional dispute with the plumbers.
In PD-39, dated the same day as PD-40, Dobson advised the architect that to avoid further delay it would complete installing the inserts and bill the contractor for general construction of all the work.
Palmere testified that he had not kept separate records for men doing insert work. The records included time for inserts, sleeves and supervision. Five months prior to trial, which was seven years after the events, he told representatives of McCarthy that an insert took half an hour to do. Based on an analysis of PD-53 (time records), the State contended that 2588 hours were spent for sleeve and insert work, which was less than 2900 hours claimed for inserts. D-59. Palmere conceded the dates and times were accurate but did not include his time for layout. Palmere conceded that time for sleeve work could not be separated out now.
At trial Dobson reduced its claim form $33,059 by deleting from the claim for costs for inserts and time for supervision, because these were Dobson's obligations, aggregating $4,904.19, making the claim $28,155. This was further reduced because of error.
The state has urged that Rutgers has paid Briscoe for doing this work as per the contract and Dobson has no claim. Since the problem arose when the contracts were open, Dobson urges that Rutgers should have issued a change order deleting this item from Briscoe's scope of the work, and claimed a credit because Briscoe was unjustly enriched.
Despite Dobson's statement above that it would bill Briscoe for this work. Dobson, even on this claim, asserted no claim against Briscoe, not even on unjust enrichment which does not require "privity of contract." However, Rutgers did assert a claim for indemnification against Briscoe on this claim.
*428 Under all the circumstances, Dobson's effort to avoid further delay, Rutgers' full knowledge of the circumstances and not only preservation of a claim against Briscoe but receipt of payment on it in an undisclosed amount in settlement, the court concludes that to deny Dobson's claim will result in unjust enrichment to the State.
The State settled the claim with Briscoe for what it determined to be adequate consideration and destroyed its right of indemnification for a higher amount. That should not prejudice Dobson.
Even where there is no direct evidence contradicting a claim, the trier of fact is not bound to accept the claim at face value where on cross-examination it is shown there are substantial doubts about the accuracy of the claim.
Based upon the demeanor of the witnesses, evaluation of the testimony of Edwin Dobson and Palmere relating to sleeve and insert work, the scope of the work and what Dobson was to do and furnish, the court concludes that the claim should be allowed but should be reduced by about one-fourth in amount. The court finds that Palmere's calculations are based on speculation, but there is evidence in the record to support a lesser number of hours as developed by the State. The data includes time for sleeves which should be eliminated. The court finds $17,616.50 to be a reasonable allowance on this claim under all the circumstances.

Cost for Draining and Refilling System for Winter 1968-69 Because of Lack of Temporary Heat
Dobson claims $3,414.29. The original claim was reduced in amount during trial. This claim is based on the actions of Dobson in draining the domestic water system in the fall of 1968 to protect it against damage from freezing, in the event that the contractor for general construction failed to provide temporary heat as required under the contract specifications.
*429 Dobson states that it filled the system so that it could test it for leaks prior to the fall of 1968. It also asserts that it tested it in the presence of a representative of the architect. It concedes that it had to sterilize the entire system of chemicals before the completion and acceptance of the job.
All contractors knew that the main boiler would not be available for temporary heat in the winter of 1968-69. In fact, the main boiler did not become available until June 1969.
Dobson concedes that Rutgers did not order it to fill the system in 1968. The earlier portions of this opinion reflect the fact that Dobson claims it did not complete some of its work until 1970. The record does not establish when the sterilization was done, but, in the fall of 1968, the towers where the toilets were to be placed were not complete. The final testing and sterilization had to be done later.
During the course of working on the contract Dobson's position was that Briscoe was liable for this claim, and it requested the owner to withhold $4,000 against the estimated cost from Briscoe. PD-44. The architect pointed out to Dobson that it was responsible for protecting its work against damage. PD-43. In response to the request to withhold $4,000, the architect requested data under G4-B.7, which gives the owner and funding sources the right of access to the site and general information.
If the contractor for general construction had agreed to provide the temporary heat at the temperature specified in the contract in the fall of 1968, and not at the courthouse door in December 1968, Dobson would not have incurred this expense. In dealing with Briscoe, Rutgers preserved a claim for indemnity against Briscoe which it has settled.
G4-D.2, unlike G4-D.1(f), does not authorize the owner to withhold any money from another contractor which causes damage. In asserting its claim for indemnification against Briscoe, Rutgers was not admitting liability to Dobson.
*430 Dobson asserted a claim against Briscoe for this amount by requesting Rutgers to withhold money. To the extent that the architect made a determination, the determination was against Dobson; hence Rutgers was not obligated to withhold. Dobson refers to no other section of the contract under which Rutgers was responsible for this claim.
The court concludes that Dobson has no claim enforceable against Rutgers for this amount. In respect to Rutgers, Dobson's activities were undertaken to protect its own work from possible damage from freezing.
In respect to the other specialized claims, the court has set forth its findings in an Appendix [not reproduced] to this opinion, because they are of interest only to the parties, involve detail and no novel questions of law.
The court notes that it disallowed the cost of preparing claims ($42,250) asserted by Broadway. These costs are analogous to the costs for experts hired in other litigation to help present the case. Such costs, like attorneys' fees, are normally borne by the respective parties. Since the State made an effort to settle, there does not appear to be a reason to depart from the normal rule.
The court has heretofore found for Dobson and Broadway and against the State on its counterclaim and awarded costs since Rutgers is the party of record. The court finds for Dobson against Rutgers in the amount of $26,155.69 on retainage, cleaning floor drains and inserts, and allows the claim on disruption based on OFE in an amount which the parties are to attempt to agree upon. Similarly, the court finds for Broadway and against Rutgers in the amount of $125,281.22 on retainage, change order and extra costs for lights, and on the claim for disruption based on OFE in an amount the parties are to attempt to agree upon. The amounts shall be included in the proposed judgments or the court will hear testimony thereon on settlement of the form of judgment. Interest at 8% on the retainage is allowed. Costs to plaintiffs.
NOTES
[1] "Briscoe" is Frank J. Briscoe Co., Inc., which held the contract for general construction aggregating $7,932,000; "Dobson" is Edwin J. Dobson, Jr., Inc., which held the contract for plumbing and fire protection aggregating $998,413; "Broadway" is Broadway Maintenance Corp., which held the contract for electrical work aggregating $2,508,650; "Rutgers" is Rutgers, The State University, and "State" means the State of New Jersey or the College of Medicine and Dentistry of New Jersey which collectively assumed all liabilities of Rutgers under the aforesaid contracts after substantial completion of the work.
[2] The terms of this statute are similar to those of the statute regulating construction contracts for political subdivisions of the State as it was then in effect. R.S. 40:9-3. The court has neither been furnished with nor found any significant legislative history of these laws. In Dobson v. Raritan Tp. Mun. Util. Auth., 115 N.J. Super. 335 (App. Div. 1971), the Appellate Division held that defendant authority did not have to award a separate contract for plumbing because it was exempt from the requirement of awarding contracts to the lowest responsible bidder under N.J.S.A. 40:14B-68; hence R.S. 40:9-3 did not apply to defendant authority.

The court notes that L. 1968, c. 108, modified the law applicable to the State, to permit the awarding of a contract for all the work on a project to a general contractor under certain circumstances. N.J.S.A. 52:32-2. A similar change was made in the law applying to all other political subdivisions of the State by L. 1971, c. 198. N.J.S.A. 40A:11-16. Since the new laws continue to provide that multiple bid contracts may be let, the question presented under the older statutes may still arise under the new ones.
[3] One work has described the critical path method as follows:

The critical path method is a new and powerful tool for the planning and management of all types of projects. Essentially it is the representation of a project plan by a schematic diagram or network that depicts the sequence and interrelation of all the component parts of the project, and the logical analysis and manipulation of this network in determining the best overall program of operation. It is a method admirably suited to the construction industry, and it provides a far more useful and precise approach than the conventional bar graphs and progress charts that previously formed the basis of construction planning and control. Furthermore, it permits the ready evaluation and comparison of alternative works programs, construction methods, and types of equipment. When the best plan has been prepared in this way, the critical path diagram clearly indicates the site operations that control the smooth execution of the works. Finally, as construction proceeds, the diagram provides the project manager with precise information on the effects of each variation or delay in the adopted plan, thus enabling him to identify the operations that require remedial action. [Antill Woodhead, Critical Path Methods in Construction Practice (2 ed. 1970) 1] See O'Brien, CPM in Construction Management (2 ed. 1971).
[4] The significant provisions of G4-F.4 are:

G4-F.4 Project Planning, Scheduling and Control ("Critical Path Method"):
As an aid to the General Contractor, and all other Contractors, to bring the completion of the project within the time allocated, the Owner has contracted for the services of a Critical Path Method Scheduling Consultant for project planning, scheduling, and control, and the General Contractor shall incorporate and enforce the combined schedule as his own. Each Contractor agrees to cooperate and coordinate his own operations in order to meet effectively all scheduled task deadlines [Emphasis supplied]
G4-F.1 made time of the essence.
G4-F.3 provided for liquidated damages of $200 per day.
G4-F.4(a) stated in relevant part:
a. Scope: The Critical Path Method (CPM) shall be used to control the timing and sequences of the project, as implemented by the CPM Consultant. All work shall be done in accordance with CPM Planning and Scheduling and it will be the responsibility of all Contractors to cooperate fully with the CPM Consultant. All costs incurred by the Contractors to implement correctly the CPM, other than the fees of the CPM Consultant, shall be borne by the Contractors and are a part of their Contracts. * * *
G4-F.4(b) Stated that the included arrow diagram and computer printout schedule were illustrative only and not binding.
G4-F.4(c) Project Planning and Scheduling:
After Contract Awards have been made to the Contractors, the CPM Consultant will meet the Contractors to establish a schedule for the development of a Working Plan and Schedule.
The CPM Consultant will conduct an orientation conference for the successful Contractors in the Critical Path Method. The Contractors shall supply information necessary to work of the CPM Consultant.
The Working Plan and Schedule will be developed in the form of a CPM arrow network diagram using the Contractors' logic and time estimates. Initially, the CPM Consultant will work with the General Contractor to detail his work, and then meet with each of the other Contractors to include all of their work in the Plan.
The arrow network diagram will be drawn in a level of detail suitable for display of all salient features of the work of each Contractor, including the placing of orders for materials, submission of shop drawings for approval, approval of shop drawings, delivery of material and all work activities to be performed by each Contractor. Each activity will be assigned a time estimate by the Contractors. With the exception of material deliveries, the time duration for any activity shall not exceed fifteen (15) days. One day shall be the smallest time unit used. On completion of the arrow network diagram, the CPM Consultant will have computer input data prepared. A computer run will then be made to generate a schedule for the project based on the information supplied by all Contractors. In the event the completion date indicated by the schedule exceeds the contractual date, the logic and time estimates used to develop the Plan will be reviewed with all Contractors. After changes in logic and time estimates have been agreed upon, another computer run will be made to generate a new schedule. This procedure will be repeated, if necessary, to provide a Plan and Schedule meeting the Contract requirements.
When completed, the Working Plan and Schedule will be submitted to the Owner for approval. The computer printout of the computed Working Plan will show job identification, job duration, job description; calendar dates for early start, early finish, late start, and late finish for each job; the total float and the jobs critical to completion of the project on schedule. When approved by the Owner, this shall become the Plan and Schedule for the Project. Each Contractor and his sub-contractors shall recognize their target dates and work toward their fulfillment. [Emphasis supplied]
G4-F(d)
d. Project Control and Updating:
The CPM Consultant assigned to this project will periodically review the job progress and update the Plan and Schedule. This will be accomplished by having the CPM Consultant call at the job site to check on the progress of the work with all Contractors. All activities scheduled to be completed and started in the next work period will be checked. In addition, information will be collected on all change orders issued since the last such period.
This information will be evaluated by the CPM Consultant. After new computer input data is prepared, a computer run will be made to produce a new computer printout of the schedule to show how changes or delays will have affected the scheduled project completion date. The new computer printout schedule will be analyzed by the CPM Consultant and a report will then be prepared including recommendations for corrective action where necessary to keep the project on schedule. This report and the new schedule will be mailed to all Contractors. Where critical decisions materially affecting job progress must be made, the CPM Consultant will hold a progress review meeting at next updating. At this meeting, all project problems will be reviewed and after necessary action has been agreed to, changes will be made to the arrow network diagram and a new computer printout schedule produced to reflect these decisions.
If the latest completion time for any significant job does not come within the time allowed by the Plan and Schedule for the Project, the sequence of jobs and/or time for performance of jobs shall be revised by the Contractor and the CPM Consultant through concurrent operations, additional manpower, additional shifts, overtime, etc., until the schedule produced indicates that all significant contract completion and occupancy dates will be met. No additional cost will be allowed the Contractor for overtime, additional manpower, equipment, additional shifts, etc., (except as provided elsewhere in the Contract) if such expediting procedures or measures are necessary to meet the agreed completion date. The Owner may elect at its sole discretion to authorize the Contractor to provide concurrent operations, additional manpower, additional shifts, overtime, etc., and to provide additional compensation therefor. Conversely, should the Contractor be responsible through his act, neglect or default for the delay of any other Contractor employed by the Owner on the work, the Owner may compensate the other Contractor for acceleration of his work, and the Contractor responsible for the delay shall be liable for and shall pay to the Owner the additional expenses connected therewith.
G4-F.4(e) Project Schedule:
This project shall be completed within 700 calendar days from the date of the Agreement.
G4-F.4(f) Pre-Bid Conference:
A representative of the CPM Consultant will attend a pre-bid conference for the benefit of interested bidders. The date and location of the conference will be established in an Addendum to be issued during the bidding period. The purpose of this meeting is to:
1. Explain what CPM is and how it will be used on the project.
2. Advise the bidders as to the information for which they will be responsible for supplying and how it will be collected and used for the management control of the project.
3. To give all bidders an opportunity to discuss the Preliminary Plan and Schedule, and to answer any questions they may have regarding the logic or time estimates used to prepare this plan.
The Contractor agrees that he will make no claim for, and have no right to, additional payment or extension of time for completion of the work or any other concession because of any misinterpretation or misunderstanding on his part of the CPM, his failure to attend the pre-bid conference, or because of any failure on his part to fully acquaint himself with all conditions relating to CPM and how it will be used on the project.
[5] See page 374 supra.
[6] Section G4-D.1(f) provides:

In case the Contractor, by his own acts or the acts of any person or persons in his employ, shall unnecessarily delay, in the opinion of the Architect, the work of the Owner or other Contractors, by not properly cooperating with them or by not affording them sufficient opportunity or facility to perform work as may be specified, the Contractor shall, in that case, pay all costs and expenses incurred by such parties due to any such delays and he hereby authorizes the Owner to deduct the amount of such costs and expenses from any monies due or to become due the Contractor under this Contract, based on the investigations and recommendations of the Architect. Nothing contained in this paragraph shall, however, relieve said Contractor from any liability or damage resulting to the Owner on account of such delay or delays.
[7] Dobson's Claims
 1. Balance due on contract $6,352.19
 2. Extra for inspecting and cleaning drains 2,187.00
 3. Extra for installation of pipe inserts on concrete
 forms which were in scope of Briscoe's work for
 which Briscoe was paid 28,155.00
 4. Extra for drilling holes in panels for piping 2,080.00
 5. Extra for draining and reactivating domestic water
 system 3,714.29
 6. Extra for furnishing bank-run gravel 30,930.00
 __________
 $73,418.48
 7. "Delay" and Disruption Damages
 a. Wages rate increases $27,893.00
 b. Additional supervision 46,588.00
 c. " equipment cost 32,581.00
 d. " central office exp. 57,970.00
 e. Interest on retainage 9,204.42
 f. Increased labor costs due to
 extended period 146,907.00
 g. Increased labor costs:
 1. Temporary heat 34,150.12
 2. Loss of elevators and stairs 17,424.85
 3. Disruption 43,359.05 $416,077.44
 __________ ___________
 $489,495.92
 ===========
 Broadway's Claims
 1. Direct Field Expense
 a. Supervisory payroll $130,583
 b. Field office 19,466
 c. Plant, equipment and tools 80,524
 d. Trucks and trailer rentals 7,364 $237,937
 ________
 2. Home Office Overhead $147,740
 Additional financial cost 56,813 204,553
 3. Loss of Efficiency
 I. Changing planned sequence of work $595,741
 II. No service elevator or stairways 116,834 712,575
 _________
 4. Damage to installed equipment from elements 9,462
 5. Additional cost of temporary light and power 16,026
 6. Increased wage rates 26,815
 7. Increased cost of materials 74,723
 8. Cost of preparation of claim 
 engineering & accounting 42,250
 9. Other extras and claims unpaid 127,543
 ___________
 1,451,884
 Profit 10% 145,188
 ___________
 TOTAL $1,597,072
 ===========

[8] The CPM consultant in the first update report, dated January 30, 1967, stated:

However, as we have not received schedules [for procurement of items  ed.] from the general and electrical contractors this CPM schedule remains incomplete and possibly inaccurate.
In the second update report, dated February 21, 1967, the CPM consultant stated:
Complete information on the general contractors procurement schedule of shop drawings and samples and fabrication and delivery times has not been received, as of February 20, 1967. Although he has stated in the past that none of these items will delay the project, it is still our request to include his schedule.
In the third update report, dated March 15, 1967, the CPM consultant stated:
The CPM schedules for both Wings now contain procurement items of each Prime Contractor as well as Owner * * *.
[9] See Antill v. Woodhead, op. cit., supra note 3 at 276-77. In the case at bar insufficient documentation was evidently compiled to use a post-construction critical path analysis to establish responsibility for and extent of delay. See also, comments in Buckley & Co. v. State, 140 N.J. Super. 289 (Law Div. 1975), where CPM technique was not used on the job but after it, to determine responsibility for delay.
[10] In federal construction contracts there is generally included some provision for "equitable adjustment" of the contractual obligations. See, e.g., United States v. Rice, 317 U.S. 61, 67, 63 S.Ct. 120, 124, 87 L.Ed. 53, 57 (1942); Roberts v. United States, 357 F.2d 938, 946, 174 Ct. Cl. 940 (1966); American Pipe & Steel Corp. v. Firestone Tire & Rubber Co., 186 F. Supp. 904, 907 (S.D. Cal. 1960). Such provision is codified within the suggested policies to be followed regarding complete or partial termination of federal contracts. See 41 C.F.R. §§ 1-8.000, -8.601(c) (1976).

The term "equitable adjustment" has come to be a term of art as used in federal contracts. See General Builders Supply Co. v. United States, 409 F.2d 246, 250, 187 Ct. Cl. 477 (1969). Although the actual use of the provision for equitable adjustment varies in different contract situations, it is generally applicable where the contractor's obligations under the contract are modified such that there is an increase or decrease in the amount due under the contract or in the amount of time allowed for performance. See United States v. Callahan Walker Constr. Co., 317 U.S. 56, 58, 63 S.Ct. 113, 114, 87 L.Ed. 49, 51 (1942). In that case the contract is "equitably adjusted" and the contractor recompensed for additional work done plus a reasonable allowance for profit. Id. at 58, 61 S.Ct. at 114-15, 87 L.Ed. at 51, 53; General Builders Supply Co. v. United States, supra, 409 F.2d at 249; Bruce Constr. Corp. v. United States, 324 F.2d 516, 518, 163 Ct. Cl. 97 (1963).
The policy factors that have lead to the development of this concept in federal contracts, such as a need to expand or abandon a particular arms program with consequent economic impact on contractors and subcontractors, do not warrant state courts adopting it wholesale by judicial fiat when traditional remedies for breach of contract are available.